# STATE v. JO A. HYLECK.*

175 N. W. (2d) 163.

February 6, 1970—No. 41656.

---

\* Certiorari denied, 399 U. S. 932, 90 S. Ct. 2267, 26 L. ed. (2d) 803.

*C. Paul Jones,* State Public Defender, and *Ronald L. Haskvitz,* Assistant State Public Defender, for appellant.

*Douglas M. Head,* Attorney General, *John C. Arko,* County Attorney, and *James J. Bang,* Assistant County Attorney, for respondent.

PETERSON, JUSTICE.

On the night of February 15, 1968, Leona Hyleck, the 53-year-old wife of defendant, Jo A. Hyleck, a Duluth businessman, was killed. A grand jury indicted defendant for the crime of first-degree murder, and, after a month-long trial, a jury returned a verdict of guilty of second-degree murder. Minn. St. 609.19. Defendant appeals from the judgment of conviction. While that appeal was pending, the matter was remanded for postconviction proceedings. Relief was denied by order entered at the close

of those postconviction proceedings. We affirm the order and the judgment of the district court.

■ Defendant's first claim is that the evidence does not sustain the jury's verdict of guilty of murder. Because the evidence is entirely circumstantial, we must review the factual record in some detail. The murder victim, the defendant, and their 13-year-old daughter, Pamela Hyleck, had dinner together in their comfortable Duluth home about 5:30 p. m. on February 15. After dinner, the daughter went upstairs to do her homework. Between 7:30 and 8 p. m. the defendant went down to his basement workshop and began working on a home-improvement project. At 9 p. m. he came upstairs to make some measurements, staying long enough to help his wife with a jigsaw puzzle and watch part of a regularly scheduled television program which ended at 10 p. m. Pamela stated that she went to bed shortly after this program was over and fell asleep shortly before 11 p. m. The only sound she heard that night was the movement of the door in the kitchen that leads to the basement.

Defendant testified that after Pamela went to bed he returned to his workshop. About 1 1/2 to 2 hours later, the defendant claims, he heard the family dog barking on the front porch. He went up and let the dog in. It was then that he noticed that his wife was not present. He began looking for her in the neighborhood, but after 20 minutes and no success, he returned home. He called the home of Judge Donald Anderson to see if Mrs. Hyleck was there. Judge Anderson answered and said that she was not. Defendant claims that he again went outside to look. Failing to find her, he again called the Andersons for assistance in locating his wife. This time Mrs. Lois Anderson told defendant that she would come right over. (They lived only a few doors away.) After she hung up, her daughter and husband agreed to join the search.

The state produced no direct evidence as to defendant's activities between the time that Pamela went to bed and the time Mrs. Anderson arrived at the Hyleck home at approximately

12:10 a. m. Mrs. Anderson had walked over while the judge and his 20-year-old daughter, Barbara, cruised the neighborhood in separate automobiles. The testimony of the Andersons does confirm, however, defendant's claim that he made two telephone calls. Defendant met Lois Anderson at the door and as they went inside he began to cry, saying, according to Mrs. Anderson, "I'm so upset, I'm so worried, I'm afraid something may have happened to her." When asked if he had looked around the house, defendant replied, "A little bit." Mrs. Anderson decided to make another short search in the area. Almost immediately after leaving the house, she found Leona Hyleck lying face down in the snow in the backyard. Because there was little light and because Lois Anderson came to within only 3 feet of the body, she was unable to realize the magnitude of the victim's wounds.

Later examination by medical experts revealed that there was massive skull damage. There was a 4 1/2-inch cut that went down the centerline of the skull from the vertex or top of the skull to the back or occipital area. A second linear defect just to the left and parallel to the centerline was 3 1/2 inches in length. The third slash was the longest, 6 1/2 inches. This was to the right of the centerline and extended from the midpoint or the vertex back to the occipital area. There was little or no bruising or tearing of the scalp next to the slashes, implying that the weapon had a sharp edge. The weapon actually entered the skull 2 or 3 inches, because bony fragments were found that far within the skull. The sheerness of the fractures and their position on the skull indicate that the head was not in motion when the blows were struck. That the victim remained stationary while the death blows were inflicted is perhaps explained by Leona Hyleck's black eye. The jury could have believed that she was struck in the face and knocked unconscious, placed in the position in which she was found, and then bludgeoned to death.

At the trial, physicians testified that the puffing which was found around Mrs. Hyleck's left eye had to have begun at least a few minutes before death, because the edematous fluid which

creates the swelling requires blood pressure, and death almost immediately diminishes this pressure. None of the medical witnesses was willing to state that the blows to the back of the head could have caused the swelling and discoloration around the eye. The St. Louis County coroner testified that in his opinion the damage to the left eye was caused by a fist; however, he said that in looking over defendant's hands that night he did not find any marks or discoloration.

Mrs. Anderson testified that when she told defendant that his wife was lying in the backyard, defendant ran to within the same distance of the body that Mrs. Anderson had, then ran back to the house to call a doctor and an ambulance, a task which, considering the emotion of the moment, Mrs. Anderson felt she was more capable of carrying out. Through the operator she reached an ambulance and the Duluth police. The latter's log shows that the call came at 12:15 a. m.

Defendant and Mrs. Anderson then went to the front sidewalk (the defendant grabbing a coat and a flashlight as he went through the house) to flag down Judge Anderson. The judge gave his wife a blanket, with which Mrs. Anderson covered Mrs. Hyleck. Defendant remained on the sidewalk while Mrs. Anderson returned to the victim and while she went to the Gehrt home next door to get assistance. It was Jerry Gehrt who, with the aid of a flashlight, was the first to realize the gravity of the wounds. Mr. Gehrt testified that even from the front sidewalk the body could be seen, as a dark form, in the backyard.

Those persons who came before the police and ambulance arrived concur in the conclusion that at no time did defendant return to his wife's side, though Mrs. Anderson did once advise him against going to the backyard. The jury was entitled to believe that in those moments following discovery of the body, defendant was strangely rational in his self-protective actions but unusually hesitant to go to the aid of his wife, whose dire condition was not revealed until later. Jerry Gehrt testified that de-

fendant came over to him when they were standing on the side-walk and said, "Jerry, please help me. For God's sake, help me."

After the ambulance arrived, defendant, Mrs. Anderson and her daughter, and Mrs. Gehrt went into the house. Immediately, defendant walked to the kitchen, saying, "They need some light out there." He went to a panel of two floor-to-ceiling windows and flipped on the outside light. As he was turning the lights on, he said, according to Mrs. Anderson, "My God, there's blood all over the snow." Under cross-examination Mrs. Anderson stated, "He did it so quickly, and he said that so fast, I thought, 'How could he see the blood.'" That event had such an impact on the two Anderson women that they reenacted it later on, a fact which was impressed upon the jury during cross-examination.

The discovery of an angle iron in the Hyleck basement is conceded to be the state's most effective evidence. This iron, which is used to strengthen corners or join beams, weighs 13 1/2 pounds. Each blade is 3/16-inch thick. It has two equal flanges which meet at a right angle. The medical experts testified that such a tool could have been the murder weapon, with any one of the three edges of the iron inflicting the wounds. The alleged weapon was found on February 19 in a corner of the Hyleck basement, resting on a waterpipe and an I-beam which supports the floor above. Both the pipe and beam were dusty. The angle iron, which was free of dust, had made four lines or creases in the dust, corresponding to the two marks made by each of the two bottom edges of the angle iron. If the iron had been there for any length of time, the dust would not have accumulated under the body of the iron.

A chemist from the Bureau of Criminal Apprehension testified that he found about 50 cotton fibers on the angle iron. If someone had wiped the iron with a soft cotton material, such fibers could have been left. Also found were flecks of type A blood, the same type as that of the deceased, a piece of flesh which could have been human, and a strand of gray human hair, which could have come from the victim's head. The iron was not

tested for fingerprints because it was the opinion of the State Crime Bureau's investigator that an examination for fingerprints would be detrimental to further examination of trace evidence.

Consistent with the hypothesis that the angle iron was used to kill Mrs. Hyleck, and then taken to the basement, is the trail of blood spots between the body's location and the basement. Samples of the blood found on the snow in the backyard, between the body and the stoop, proved to be type A. The samples taken from the side door and the "threshold" of the door also were type A. Minute bloodstains were taken from the seven basement steps by chipping off paint on which they lay. Under a microscope, about 1/3 of the 28 chips contained human blood. However, the quantity of blood available for sample, collectively, was so small that a typing could not be taken.

The state attempted to establish as a motive a failing marriage and an outside affair, the latter being detailed by Roberta Pietrowski, the woman involved. Miss Pietrowski, 27 at the time of trial, said that she met defendant soon after she began working for the insurance agency where he was employed. At first, defendant and Miss Pietrowski would go out for a drink after the Monday night rush. Soon they were seeing each other for longer periods. Sometime in 1963 they became intimate. They would usually meet in Duluth's "West End" on Mondays and Fridays and "approximately a dozen times" they took off together on trips outside the city. These were usually to Minneapolis, and usually lasted just one night. One one trip, however, they spent 4 days together in Wisconsin and upper Michigan. On this, as well as several other occasions, they registered as Mr. and Mrs. Hall. Mutual love was expressed, and at least once they had discussed the possibility of getting married after defendant obtained a divorce from his wife.

Defendant's contacts with Miss Pietrowski did not cease after the murder. He called her from his home on the day following the death of his wife to say that he could not see her for awhile

and talked to her two or three other times, all over the telephone.

We hold that the evidence is sufficient to sustain the jury's verdict.

■ Defendant contends that the officers who carefully searched his home on the afternoon of February 19, seized the angle iron, and scraped the faint patches of blood off the basement steps, conducted an unconstitutional search and seizure and that his conviction should be overturned because the evidence gathered was a vital link in the state's case.

Even though a search is conducted without warrant, it will be upheld if the party who can properly object has given voluntary consent. State v. Stewig, 281 Minn. 331, 161 N. W. (2d) 673; Bumper v. North Carolina, 391 U. S. 543, 88 S. Ct. 1788, 20 L. ed. (2d) 797. Testimony at the Rasmussen hearing indicates defendant consented to this search. At about 5:30 p. m. on the afternoon of Sunday, February 18, defendant's daughter-in-law (Hyleck's 25-year-old son and his wife had flown to Duluth soon after hearing of Mrs. Hyleck's death) called the Anderson home and said that the Hylecks had something they wanted to discuss with the judge and his family. Upon invitation, the Hylecks walked over to the Anderson home. The first subject of conversation was whether one of Hyleck's disgruntled clients could have killed Mrs. Hyleck. Eventually, however, defendant approached Judge Anderson and said, "Don, there's something that I would like to talk to you about." They then began discussing where a possible murder weapon could be hidden. The area under the front porch was suggested. According to Judge Anderson, defendant then said:

"* * * Tell the police to come out * * * and search around. Look under the front porch. Don't break anything, but tell them to go in on the garage side, because I have to make repairs and paint over there anyway.

"* * * Tell [Russell Barber, a policeman] to go into the house; look around; don't break anything; don't do any damage."

Mrs. Anderson corroborated her husband's recollection of Hyleck's directive. She said he suggested that "they look every-place," "anyplace they want." There was no reason to give permission to enter the home if only the space under the porch was to be searched for one cannot gain access to that area from within the house.

At trial defendant abandoned his assertion that he gave permission only to search the porch, perhaps to create in the minds of the jury the image of a confident, helpful defendant:

"Q And did you, in fact, turn over those keys with full willingness that the police use those any way they wanted to in connection with their investigation?

"A I would have had no objection, but I—I just gave Don the keys to do what he wanted to do with them.

\* \* \* \* \*

"Q At any rate, I gather then that you gave those keys to Judge Anderson without any reservations or conditions?

"A That's correct."

Assuming without deciding that Judge Anderson was an agent of the State of Minnesota for purposes of receiving the consent to search, there was no denial of defendant's right to be free from arbitrary search and seizure, a right guaranteed by the Fourth and Fourteenth Amendments. Waiver of the right to be free from a warrantless search is not lightly inferred, but defendant's invitation to enter his home was freely given, without even the subtle compulsion that may be present when consent to search is given after arrest. See, Judd v. United States, 89 App. D. C. 64, 190 F. (2d) 649; United States v. Richardson (6 Cir.) 388 F. (2d) 842; United States v. Lewis (S. D. N. Y.) 274 F. Supp. 184. We hold that the evidence obtained from the search was properly admitted.

■ During the cross-examination of defendant, the prosecutor asked about prior acts in which he allegedly had exhibited fits of anger. The questions asked were more descriptive and ac-

cusatory than interrogatory. It is in the trial court's allowance of the innuendoes of prior embarrassing episodes, unsubstantiated either before or after the cross-examination by independent evidence, that the defense grounds its second contention that the conviction should be reversed.[1]

The prosecution probed into an alleged disagreement between defendant and his wife over the remodeling of the house, supposedly witnessed by the craftsman engaged in that project:

"Q  So she made a suggestion in his presence as to one way in which the work should be done, and you disagreed with that, and you turned to her curtly and told her to shut her mouth?

"A  I have never used those words in my life, Mr. Bang.

"Q  You deny saying that?

"A  I deny using those words to my wife.

"Q  Let's go to another one; let's go to Mr. Dryke: He is the plumber, and he too was involved in the remodeling of the house, was he not?

"A  Yes, sir.

"Q  Changing pipes and what not?

"A  (Nodded affirmatively.)

"Q  You had a disagreement with this gentleman?

"A  Quite definitely.

"Q  And even threatened to assault him?

"A  That is not true.

\*  \*  \*  \*  \*

---

[1] Not included in the review which follows are several technically improper periods of cross-examination of both defendant and Harry Gooch, one of the defendant's character witnesses. These episodes are not discussed because they involve merely the insinuation that the defendant and his mistress were carrying on an affair at the office and that the latter may have been dismissed when they were caught in an embrace. It is difficult if not impossible to comprehend what new damage can be done by mention of a love affair during working hours, after the mistress has herself given dates of the trips they took together and even the names of the motels in which they stayed.

"Q    Didn't you order him off the premises?

"A    No, sir.

"Q    You did not threaten him with any violence at all?

"A    No, sir.

"I ordered him to take the tradesman that was working for him off the premises. I told him he could come himself, but I did not want that man back again."

The state then questioned defendant about an incident with a babysitter:

"Q    And while one of these babysitters was there, did you not use abusive language towards your wife?

"A    I don't even know the babysitter, Mr. Bang. I can't answer that question.

The prosecutor went on,

"Q    Do you know a Mr. Hasty or Miss Hasty?

"A    Would you spell the name, please?

"Q    H-a-s-t-y.

"A    Mr. Hasty, yes.

"Q    And how do you know him?

"A    He is the janitor in the building, the Christie Building.

"Q    On one occasion, did you display a fit of anger in Mr. Hasty's presence?

"A    Never.

"Q    Well, let me refer you to the incident, Mr. Hyleck: The Christie Building has its own parking facilities, does it not?

"A    Yes.

"Q    And you have a parking place there?

"A    Yes.

"Q    And on one occasion, somebody had inadvertently parked in your parking spot and —"

The questioning was then cut off by defense objections.

We have consistently held that it is improper for the state to introduce specific instances of defendant's wrongdoing to rebut the testimony of his character witnesses, and that the practice

is more condemnable when it is accomplished on cross-examination of the defendant, by innuendoes unsupported by competent evidence. State v. Flowers, 262 Minn. 164, 114 N. W. (2d) 78; State v. Nelson, 148 Minn. 285, 181 N. W. 850; State v. Silvers, 230 Minn. 12, 40 N. W. (2d) 630; State v. Gress, 250 Minn. 337, 84 N. W. (2d) 616; State v. Gulbrandsen, 238 Minn. 508, 57 N. W. (2d) 419.

In State v. Flowers, *supra,* we thoroughly reviewed the reasons for rejecting this type of evidence. There we reversed a conviction for second-degree assault because the prosecutor's accusations, even though unproved, dealt with an alleged prior act so similar to the act upon which the assault charge was based, and were so persistent, that the jury could believe the defendant was a bad man and should be punished even if he was not guilty of the offense charged. The cross-examination of Flowers was as follows (262 Minn. 165, 114 N. W. [2d] 79):

"Q   Mr. Flowers, on Friday night, March 25th, 1960, didn't you take and break a broom handle over the back of Alice Smith?

"A   Sir, am I on trial for Alice Smith or Darwin Morrow?"

\*   \*   \*   \*   \*

"Q   And isn't it a fact, Mr. Flowers, that after you broke the broom handle over the back of Alice Smith, you pulled a knife on her?"

\*   \*   \*   \*   \*

"[A]   It's not a fact."

\*   \*   \*   \*   \*

"Q   And isn't it a fact that after you pulled the knife on her, that she attempted to grab the knife and got cut on her hand?"

\*   \*   \*   \*   \*

"A   It's not a fact, period."

Later in the cross-examination, the prosecutor asked, "Mr. Flowers, while you were in the armed services, did you ever assault anyone?" An objection cut off this line of questioning.

In the Silvers case, cited with approval in Flowers, the de-

fendant was also charged with assault. The state attempted to introduce evidence of other assaults to impeach the defendant's wife, who denied on cross-examination that she had ever been present when defendant had struck anyone. Unsuccessful in this endeavor, the prosecutor asked if the defendant had ever struck the witness herself. For the mere asking of the question, we reversed and granted a new trial, saying (230 Minn. 19, 40 N. W. [2d] 634):

"* * * Obviously, nothing would have prejudiced the jury more effectively against defendant than to give it the impression that he was a wife beater. *Jurors, to their credit, are likely to regard a blow struck a woman as wholly inexcusable and discreditable to the offender*—doubly so if the woman is offender's wife. Since the prosecuting attorney was a public official, the jury naturally thought he must have evidence to support his innuendoes." (Italics supplied.)

Rules of law can be intelligently applied only when there is candid recognition of the circumstances surrounding their birth and continued application. When the facts of a case are sufficiently dissimilar that the reasons which had previously induced application of the principle are no longer cogent, that rule must not dictate the result. In defendant's trial, the improper questioning comprised only a few minutes in a month-long trial remarkably free of evidentiary error. It was not the lengthy persistent questioning in a short proceeding which was the situation in the Flowers and Silvers cases. More important, the accusations, assuming them to be true, did not comprise important evidence in this case, as they did in the other cases. Nor were defendant's alleged prior fits of anger criminal acts or as serious as the actual striking of a person. Also, defendant's counsel did not let the absence of evidence to substantiate the assertions of the prosecution go unnoticed, as was true in the other cases. Counsel for the defense said in his final argument to the jury that defendant denied all the prosecution's accusations and that,

if there had been any factual foundation for those claims, it was incumbent upon the state to produce the witnesses to the events.[2]

To decide whether error has resulted in prejudice, this court must consider the error within the context of the conduct of the trial and the nature of the evidence. We cannot say in this case that there is a likelihood that the improper cross-examination of defendant contributed to the conviction. The weighty circumstantial evidence against him was presented in a deliberate, thorough fashion. Next to it, the unsupported innuendoes were quite superfluous.

■ Defendant further contends that it was improper for the trial judge to submit to the jury a lesser degree of the crime for which defendant was indicted. The state charged him with first-degree murder and he was convicted of second-degree murder.

In there was evidence from which a jury could find that defendant killed his wife with intent but without premeditation, the submission of an instruction covering second-degree murder was proper. In State v. Pankrantz, 238 Minn. 517, 539, 57 N. W. (2d) 635, 647, the court said, "Where the evidence will justify a verdict of a lesser degree of the crime than is charged in the indictment, defendant may not demand as a matter of right that the court submit only the degree of the crime charged in the indictment."

---

[2] After reviewing the accusations made by the prosecution, counsel for defendant said, "Now, why would this be done? You jurors have got this right, to accept at face value the answers that Mr. Hyleck gave to those questions, because if there was any basis to it, it would have been incumbent, not only because of law, but because of fairness, for Mr. Bang to have brought these people into court. These are people who obviously live in the City of Duluth. They were names that were supplied to the prosecution not by the defense. This was done as part of Mr. Bang's investigation and preparation for trial, and he failed to bring them.

"Now, why did he do it? To implant in the mind of this jury a basis of prejudice, so that the jury will close its eyes to the law and to the facts."

Defendant argues that the jury should have been allowed to find him guilty or not guilty of first-degree murder only. He contends that since the medical experts concurred in the conclusion that the blows to the back of Mrs. Hyleck's head could not have caused the trauma in the left eye and the eye injury was caused by a blow which preceded death by "minutes," the killer necessarily possessed the premeditation which distinguishes first-degree murder from second-degree. It is in the last phrase that defendant's argument fails. We have repeatedly stated that premeditation is not a coefficient of time and can never be presumed from a given state of facts.[3] The trial judge ably summarized the law when he told the jury:

"Premeditation, being a process of the mind, is wholly subjective and hence incapable of direct proof. It may be inferred from all the circumstances surrounding the homicide. Nor is it necessary that the design to effect death exist for any specific length of time."

The jury could have found that no premeditation was formed in the mind of defendant in the minutes before he killed his wife.

■ Defendant's last contention is that there was a denial of due process of law, or at least reversible error, when the state failed to reveal to the trial judge and to defendant certain information which became known to the prosecution at 9 p. m. on the evening of May 15, 1968, approximately 1 hour before the jury returned with the guilty verdict. At that time Assistant St. Louis County Attorney James J. Bang, waiting in his court house office, received a call from one Phillip Sund. What Sund told Bang was retold by Gary Doty (Sund is in the armed forces serving in South Vietnam) at the postconviction hearing held in Duluth on September 19, 1969. Sund and Doty worked at Some-

---

[3] See, State v. Campbell, 281 Minn. 1, 12, 161 N. W. (2d) 47, 55; State v. Keaton, 258 Minn. 359, 364, 104 N. W. (2d) 650, 655; State v. Hare, 278 Minn. 405, 407, 145 N. W. (2d) 820, 822; State v. Gowdy, 262 Minn. 70, 74, 113 N. W. (2d) 578, 581.

body's House Restaurant in Duluth. On the night the murder occurred, they left at 12:19 a. m. (according to their time cards); just as they got outside, they heard sirens and saw an ambulance go by. Out of curiosity, they followed it until it stopped at the Hyleck home. They walked up to the public sidewalk running in front of the house and could see the form of a body in the back of the area between the houses. As they began walking toward the body, a man came toward them and told another person near them, "There's been foul play here." Sund and Doty immediately turned around and began walking toward their car, when Judge Anderson came up and asked them what they were doing there. They explained that curiosity motivated their presence, and they left soon thereafter. During most of the short time they were there, said Doty, defendant stood on the front porch, trying to get the family dog to come in. At no time did the boys talk to him.

When Mr. Bang finished his phone conversation with Sund, he immediately called Detective Sergeant Floyd Bowman, the primary investigative officer on the case, and related what he had been told. It was not until the morning after the verdict was returned that the trial judge was informed of the situation.

The role of Sund and Doty in that evening's events, in itself, is of little substantive importance; defendant's claim of prejudice is founded upon the effect the revelation of the "suppressed" evidence would have had in bridging what defendant has termed his "credibility gap." At trial defendant testified that just after he walked to the sidewalk to flag down Judge Anderson, and while Mrs. Anderson was at the Gehrts' front door, defendant saw a boy whom he believed to be Tom Anderson, Judge Anderson's son, standing nearby. Defendant asked that person to summon Dr. Walder, the physician who lived in the neighborhood. When questioned on his recollection of this stranger, defendant said:

"A  * * *  [I]t was a man, a male figure, a man or boy, with white and black plaid wool jacket, dark pants, but he was about

the height and the size, and he had hornrimmed glasses like Tom wears.

"These were the only people we had called for help was the Andersons, so I presumed that Tom came down with the rest of the family. Since Barbie was there, Tom came too.

"Q   Did you see what this person did after you made that comment?

"A   Well, other than to see him head this way (indicating) toward Walders', you know, cut across here (indicating), between the sidewalk—went across here through the snow, this direction (indicating), I turned and looked back up Lakeview Drive, because that's where Don would be coming from.

"Q   Again, I gather there was no conversation, words from him to you, or any conversation other than your statement to him?

"A   No, no.

"Q   Did you ever again that night see either Tommy Anderson at the scene or anyone that looked like him?

"A   No, I don't recall."

Defendant points out that his defense was in essence his denial of guilt and that any episode which would detract from the believability of that denial was a weapon for the prosecution. The state in its closing argument did imply that defendant's story of a stranger on the scene was an attempt to inject uncertainty into the state's case.

A careful analysis of the Sund and Doty statements and defendant's testimony shows that his credibility would not have been greatly enhanced by the admission of the boys' story: Defendant says he saw the stranger about 15 minutes before the time Sund and Doty say they arrived; defendant says that he saw just one boy, not two, and that he was 4 or 5 feet from the public sidewalk when he saw the young man. The boys say defendant never left the front porch. Furthermore, the evidence of the presence of Sund and Doty would not contradict Officer

Barber's statement that defendant had never mentioned seeing a man with horn-rimmed glasses, dark trousers, and a lumberjack-type jacket.

In deciding whether whatever assistance the late-discovered evidence would have rendered to the defense warrants a new trial, we are aided by a decision of this court and several Federal cases. In State v. Blankenship, 277 Minn. 32, 151 N. W. (2d) 410, notwithstanding the defendant's insistence that he was not the man who robbed a store, a jury found him guilty. Unknown to the defendant's counsel throughout the trial, the prosecution was in possession of a police report containing a statement made by a woman who claimed to have spent the night of the robbery with the defendant. At the hearing on the motion for a new trial, the woman completely contradicted her previous story. We affirmed the conviction, saying (277 Minn. 34, 151 N. W. [2d] 412):

"* * * [T]he statement to the police investigator cannot reasonably be regarded as exculpatory since it does not expressly indicate she was with him at the time of the robbery. It is clear that any claim of prejudice to defendant's right to a fair trial by nondisclosure was erased by Mrs. Hurd's testimony at the hearing on the motion. Further, any claim that the statement alone would have been useful to the defense is purely speculative in view of the fact that the record is replete with direct and circumstantial evidence identifying defendant as the person who committed the robbery. Defendant's proof falls far short of the essentials necessary to justify a new trial."

The value of the new evidence is more speculative and the circumstantial evidence against defendant is stronger in this case than in the Blankenship case.

There has been an increase in the number of Federal court decisions dealing with a criminal defendant's contention that his trial was prejudicially tainted by the prosecution's "suppres-

sion" of evidence favorable to him.[4] These cases have involved inducement of perjury by the prosecution,[5] knowing use of false evidence and failure to reveal exculpatory evidence,[6] refusal upon request to reveal exculpatory evidence,[7] good-faith failure to disclose material evidence,[8] and good-faith failure to disclose evidence of only speculative value to the defense.[9] All the decisions are inapposite in that never had the evidence been discovered as late in the trial as it was in this case, and most are inapposite in that the prosecution in the Hyleck trial was unquestionably honest throughout the proceedings.

The decisions are uniform in demanding that the appellant show a materiality of the evidence that exceeds that showing made by defendant here. For example, in United States ex rel. Fein v. Deegan (2 Cir.) 410 F. (2d) 13, a case in that category most descriptive of the instant situation, the suppressed evidence was far more valuable to the defense than the new evidence in the present case. The defendant was convicted of murder. The evidence against him was strong: His mistress stated that she was asked to help dispose of the body and that she actually saw a portion of a human body in a large trunk. The defendant rented a station wagon to carry the trunk, and had

---

[4] "Suppression" has become more a term of art referring to the failure to reveal evidence which becomes available before the jury returns than a literally correct interpretation of the prosecution's conduct. For general discussions of the development of law in this area and the use of this term, see Note, 74 Yale L. J. 136; Note, 34 Brooklyn L. Rev. 269; Note, 60 Col. L. Rev. 358.

[5] Mooney v. Holohan, 294 U. S. 103, 55 S. Ct. 340, 79 L. ed. 791.

[6] Hamric v. Bailey (4 Cir.) 386 F. (2d) 390; Miller v. Pate, 386 U. S. 1, 87 S. Ct. 785, 17 L. ed. (2d) 690; Napue v. Illinois, 360 U. S. 264, 79 S. Ct. 1173, 3 L. ed. (2d) 1217; Giles v. Maryland, 386 U. S. 66, 87 S. Ct. 793, 17 L. ed. (2d) 737.

[7] Brady v. Maryland, 373 U. S. 83, 83 S. Ct. 1194, 10 L. ed. (2d) 215.

[8] Levin v. Katzenbach, 124 App. D. C. 158, 363 F. (2d) 287; Barbee v. Warden (4 Cir.) 331 F. (2d) 842.

[9] United States ex rel. Fein v. Deegan (2 Cir.) 410 F. (2d) 13.

friends help him throw it into the Harlem River. These same friends helped fill holes in the wall, destroy carpeting, and remove furniture. The suppressed evidence was the statement by a young prostitute, Dagmar, that she called the defendant's mistress at such a time and place that the mistress may have been implicated as a principal in the crime—her credibility would certainly have been questioned. This statement was corroborated by Dagmar's husband. This evidence was substantively relevant to the crime charged, and, even assuming that it was untruthful—as the trial judge found after a hearing—its potential in the hands of defense counsel greatly exceeded that of the Sund and Doty statements. Yet the court there affirmed the conviction. We reach the same conclusion in this case. The materiality of the presence of Sund and Doty is too speculative to warrant a new trial.

Affirmed.

MR. JUSTICE ROGOSHESKE took no part in the consideration or decision of this case.