STATE of Minnesota, Respondent,

v.

**Guy James HATHAWAY, Appellant.**

No. C7–85–1.

Supreme Court of Minnesota.

Dec. 20, 1985.

Michael F. Cromett, St. Paul, for appellant.

Thomas Foley, Ramsey Co. Atty., Steven C. DeCoster, Asst. Co. Atty., St. Paul, for respondent.

SCOTT, Justice.

This is an appeal of a first-degree murder conviction rendered by a Hennepin County District Court jury against defendant Guy Hathaway. Hathaway contends that the district court, apart from making several erroneous evidentiary rulings, improperly joined him and a codefendant, Harold Gustafson, for trial. He also contends that Minn.R.Crim.P. 9.01, subd. 3(2), which protects certain information regarding prosecution witnesses, is unconstitutional. We affirm.

At approximately 8:50 p.m. on Sunday, October 24, 1982, three armed men wearing ski masks entered the Mounds Park Hospital in St. Paul. They proceeded to the ground floor where the hospital pharmacy was located. Charles Glaser, an operating engineer for the hospital, was walking from his office toward the pharmacy that evening. Glaser was approached by one of the masked men who pointed a silver-barreled gun at Glaser's midsection and ordered him to have the pharmacist unlock the door to the pharmacy. Elaine Roby, the pharmacist on duty, saw two of the masked men peering in the window of the pharmacy. She immediately called the hospital switchboard for help. Kay McAllister, a pharmacy technician, saw Glaser and a man wearing a ski mask through the window of the pharmacy. She screamed and ran to a part of the pharmacy that was out of the view of the masked men. One of

the intruders thereafter jumped through the bars on the pharmacy window and unlocked the door to the pharmacy. Two of the masked men immediately ordered the pharmacist to retrieve all the "Class A drugs" from the pharmacy vault, while the other ordered Glaser and McAllister to lie on the floor.

The hospital switchboard operator received the pharmacist's call for help and immediately conveyed the message to Richard Walton, an off-duty police officer and hospital security guard, who was seated next to her at the reception desk on the first floor of the hospital. Walton ran to the elevator and took it down one floor to the pharmacy. As Walton approached the door to the pharmacy he was noticed by the man guarding Glaser and McAllister. The man fired a single shot at Walton through the pharmacy window. Other shots were then fired in rapid succession. The three men ran from the pharmacy. Walton was found face down on the floor, one foot from the elevator door. Twelve hours later he died from a single gunshot wound to the head.

Police investigating the scene found a trail of blood leading from the pharmacy door down the hallway and up the stairs to the east exit of the hospital. Spots of blood were also discovered outside the hospital on the sidewalk and on the asphalt. One block from the hospital a car was found parked diagonally into the street. There were blood stains on the seat, on a plastic mat on the floor and on the bottom of the rear right door.

Two days after the shooting the police received information from a citizen that linked a man named Timothy Eling to the shooting. The informant told the police that Eling had been shot and that a man named Bill Dwyer had specific knowledge of the crime. The next day Dwyer told police that he had taken part in an attempt to rob the pharmacy on Friday, October 22, 1982, with Eling and two men named Guy Hathaway and Harold Gustafson, but that the robbery had been called off. Dwyer also disclosed to the police the descriptions of the weapons and car used in that robbery attempt.

On October 27, 1982, Eling was arrested and taken to St. Paul-Ramsey Hospital for treatment of two gunshot wounds in his lower right leg. Dr. James Sturm concluded that the wounds were at least 24 hours to less than one week old. The Minnesota Bureau of Criminal Apprehension determined that Eling's blood type matched the samples found at Mounds Park Hospital and in the abandoned car.

On November 19, 1982, the St. Paul police received a call from a man named George Leslie. Leslie told the police that he was to have robbed the hospital pharmacy with Eling, Gustafson and Hathaway on Sunday, October 24, 1982, and that he had "cased" the hospital with Eling on two separate occasions. He said he later decided not to participate in the robbery and did not meet the other three at the agreed-upon time.

Eling was charged with the intentional, premeditated murder of Walton and with the intentional killing while committing a felony. He was convicted by a jury, and this court affirmed his conviction in *State v. Eling*, 355 N.W.2d 286 (Minn.1984).

Guy Hathaway and Harold Gustafson were arrested on February 11, 1984, in Carpenteria, California. They were both charged with first-degree murder, felony murder, and conspiracy to commit aggravated robbery.

Hathaway and Gustafson moved for a change of venue pursuant to Minn.R. Crim.P. 25.02. The Ramsey County District Court ruled that the extensive publicity surrounding the case created a reasonable likelihood that there would be prejudice if it were tried in Ramsey County. The trial was therefore moved to Hennepin County.

The state moved for a joint trial of the defendants pursuant to Minn.R.Crim.P. 17.-03, subd. 2(1). The trial court granted the motion, stating:

I'd like to comment that I'm persuaded by the fact this would be a complex trial

involving a large number of witnesses, and I think that is a factor which weighs toward joining the two Defendants. * * I'm also persuaded not by the defense argument, but I'm persuaded by the fact there may be one trial followed by a second one, and the prejudicial publicity which the state has characterized would fall out of the first trial, might influence the jurors on the second. * * * Defendants have not demonstrated to me their inconsistent defenses, such that requiring them to be in the trial together would be prejudicial to them. * * * The matter is within the discretion of the Court, and I think in the interest of justice, and based on the defense's failure to show prejudice, that a joint trial is appropriate in this case, and I will so order.

A joint trial commenced on July 18, 1984.

At trial, several hospital employees testified to the identification of defendant Hathaway. Donna McDuffey, a dietary coordinator at Mounds Park Hospital, testified that she saw a man fitting Hathaway's description on the Friday before the attempted robbery when he changed a five-dollar bill at her cash register in the hospital cafeteria. Helen Brisson, a dietary aide at the hospital, testified that she saw a man she later identified as Hathaway at approximately 1:00 p.m. on Friday, October 22, 1982, in the food-vending machine area on the ground floor of the hospital where he asked her for some ketchup. Ruth Tasler, a registered nurse, testified that on either the Tuesday or Thursday before the robbery attempt she saw a man on the ground level of the hospital near the central supply and pharmacy area. The man had long curly hair and a beard and was wearing a black leather jacket and jeans. From a photo display presented to her two weeks after the attempted robbery, she had identified the man as Hathaway. At trial, however, she was unable to recognize and identify the defendant.

Alleged coconspirators William Dwyer and George Leslie testified for the state at trial, as they had at Eling's trial. Dwyer testified that he had known defendant Hathaway for two years and that at the time of the robbery Hathaway had long hair and a beard, and often wore blue jeans and a black leather jacket. He told the jury that he, Gustafson, Hathaway and Eling had had Denise Loftus, a friend of the defendants, purchase a car on Thursday, October 21, 1982, for $250, to be used as a "throwaway" vehicle in the robbery. He also told the jury of the first attempt by Gustafson, Hathaway, Eling and himself to rob the hospital pharmacy on Friday, October 22, 1982. On that day, he entered the hospital first and determined that too many people were near the pharmacy. He waved the others away, and no robbery took place. He testified that he withdrew from the robbery plans at that time, and first learned of the Sunday shooting at the hospital on Monday morning when he saw the newspaper.

George Leslie testified that at approximately 1:00 p.m. on the day of the robbery he, Gustafson, Hathaway, and Eling had discussed how they should rob the hospital pharmacy. He stated that he left after the "planning session" ended at 5:00 p.m., and was to meet the others at 7:00 p.m. He testified that he never met them because he considered the robbery too risky. He said he first heard of the robbery on his police scanner Sunday night.

Eling testified in behalf of the defendants. He stated that Dwyer and Leslie—not Hathaway and Gustafson—were involved in the robbery with him on Sunday, October 24, 1982. Paul Seydel, a friend of the defendants, testified that Gustafson and Hathaway arrived at his house on Sunday, October 24, 1982, at noon. He stated that the three proceeded to repair a motorcycle and drink beer until approximately 2:30 or 3:30 p.m. Hathaway presented no affirmative defenses or alibi. He did not testify in his own behalf.

Hathaway raises the following issues:

(1) Whether the district court, pursuant to Minn.R.Crim.P. 17.03, subd. 2(1), improperly joined Gustafson and himself for trial.

(2) Whether Minn.R.Crim.P. 9.01, subd. 3(2), violated his right to obtain disclosure

of information under *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490 (1966), and exculpatory evidence under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

(3) Whether the use of photo displays by the police violated his due process rights.

(4) Whether the district court improperly admitted into evidence photos of the victim in police uniform.

(5) Whether the evidence was sufficient to allow the jury to convict him of the offenses with which he was charged.

■ 1. Hathaway contends that the district court erred when it granted the state's motion for a joint trial and denied his motion for severance. Minn.R.Crim.P. 17.03, subd. 2(1), concerns the joinder of defendants in felony and gross misdemeanor cases. It reads:

> When two or more defendants shall be jointly charged with a felony, they shall be tried separately provided, however, upon written motion, the court in the interests of justice and not solely related to economy of time or expense may order a joint trial for any two or more said defendants. In cases other than felonies, defendants jointly charged may be tried jointly or separately, in the discretion of the court. In all cases any one or more of said defendants may be convicted or acquitted.

When determining whether a case falls under the general rule of severance or under one of the exceptions warranting joinder, we have made an independent inquiry into any substantial prejudice to defendants that may have resulted from their being joined for trial. *See State v. Eaton,* 292 N.W.2d 260, 265–66 (Minn.1980); *State v. DeFoe,* 280 N.W.2d 38, 40 (Minn.1979); *State v. Strimling,* 265 N.W.2d 423, 431–32 (Minn.1978); *State v. Swenson,* 301 Minn. 199, 201–02, 221 N.W.2d 706, 708 (1974).

Hathaway contends that the joinder of the defendants resulted in substantial prejudice to him at trial. He notes that in an opening statement to the jury, counsel for Gustafson stated that Gustafson would testify. Hathaway argues that such a reference in front of the jury prejudicially highlighted the fact that he would not be testifying.[1] In *Eaton* we rejected a similar argument. One of the two defendants in the joint trial in *Eaton* testified. The other defendant, on appeal, argued that the first defendant's testimony tended to shift the blame to him. We held that the theory of defense expounded by the non-testifying defendant did not conflict with, and indeed was consistent with, the testifying defendant's statements on the stand. 292 N.W.2d at 265–66. *Eaton* did not recognize any inherent prejudice when one defendant testifies and the other does not. *Id.*

Hathaway also contends that he was prejudiced when Gustafson presented evidence showing that Gustafson fled the state after the shooting because of a parole problem. As part of this alibi theory, Gustafson allowed evidence to be admitted regarding his prior convictions, his prison sentence, his violation of parole, and his character. Hathaway argues that this evidence regarding Gustafson tainted him. We have, however, recognized the ability of juries in joint trials to separate evidence that inculpates only one defendant from evidence that inculpates both. In *Strimling,* we noted:

> It is asserted that Hedlund's conviction was to a significant extent the product of a spillover effect caused by the added bulk of the evidence relevant only to Strimling's guilt. If we agreed that the jury in this case was unable to separate the evidence as it applied to each defendant, we would undoubtedly find Hedlund's contention more forceful.

265 N.W.2d at 432.

Hathaway argues further that he was prejudiced when statements that inculpated only him were elicited by Gustafson's counsel. During the cross-examination by Gustafson's counsel of state's witness George Leslie, Leslie implied that Hathaway had made threats to him after Hathaway and

---

**1.** Gustafson ultimately decided not to testify.

Gustafson were apprehended. Hathaway's counsel attempted to have the questions that would elicit inculpatory statements withdrawn, but ultimately did not succeed. Hathaway argues that the implication of such a threat, when in fact no threats were established, was substantially prejudicial. Hathaway further notes that when cross-examining state's witness William Dwyer, Gustafson's counsel elicited information from a conversation between Dwyer and Timothy Eling that the state had previously been ordered not to delve into. The state, on redirect, was allowed to ask Dwyer about the information Gustafson's counsel had opened up on cross-examination.

The evidence regarding an alleged threat made by Hathaway and the conversation between Eling and Dwyer arguably prejudiced Hathaway. Such evidence would not have been elicited at a separate trial of Hathaway. The introduction of such evidence, however, does not constitute "substantial prejudice." In *Strimling,* we stated:

> It is true that certain testimony at trial was admissible as to one defendant and hearsay as to the other; however, the jury was carefully cautioned to consider only the evidence properly admissible against each defendant. We have carefully reviewed the record and find that even if the jury disregarded the court's instructions, the relatively small quantity of hearsay testimony admitted was entirely cumulative and without prejudice.

265 N.W.2d at 432. The two episodes in which Gustafson's counsel elicited statements that tended to inculpate Hathaway are, under *Strimling,* not prejudicial enough to warrant a new separate trial. The evidence was a "relatively small quantity" of testimony.

Furthermore, the theories of defense expounded by Hathaway and Gustafson were not "antagonistic" or "inconsistent." One

defendant did not seek to put the blame on the other, *see Swenson,* 301 Minn. at 202, 221 N.W.2d at 708, and the defendants regularly adopted the motions and objections of the other, *see Strimling,* 265 N.W.2d at 432. Although the defendants did not always agree on trial strategy—Hathaway would have rested his case after the testimony of Eling, whereas Gustafson decided to call two more witnesses—mere differences in trial strategy do not rise to the level of "substantial prejudice." This is not a case in which the state introduced evidence that showed only one of the defendants killed the victim, thus forcing each defendant to "point the finger" at the other. *See, e.g., Commonwealth v. Moran,* 387 Mass. 644, 442 N.E.2d 399 (1982). Nor is this a case in which the jury was forced to believe either the testimony of one defendant or the testimony of the other. *See, e.g., State v. Kinkade,* 140 Ariz. 91, 680 P.2d 801 (1984); *Jenkins v. State,* 230 A.2d 262 (Del.1967). Instead, the jury was faced with the choice between the state's theory that Hathaway and Gustafson attempted to rob the pharmacy with Eling and the theory, expounded by both defendants, that Dwyer and Leslie attempted to rob the pharmacy with Eling. Hathaway and Gustafson did not even attempt to place the blame on each other. No substantial prejudice is evident.

Therefore, Hathaway's contention that the factors relied upon by the trial court did not constitute a valid basis upon which to deny appellant a separate trial is not persuasive when balanced against the insignificant prejudice alleged to have been caused thereby. The reasoning recited by the trial court meets the requirements of Minn.R.Crim.P. 17.03, subd. 2(1).

2. Pursuant to Minn.R.Crim.P. 9.01, subd. 3(2), the state filed a certificate with the district court indicating that information regarding three potential witnesses[2]

---

**2.** The three witnesses the state sought to protect under the Rule 9.01 certificate were Denise Loftus, the woman who allegedly purchased the "throwaway" car for the robbery; William Dwyer, who allegedly attempted to rob the phar-

macy with defendants on Friday, October 22, 1982; and George Leslie, who allegedly helped plan the Sunday robbery with defendants. The state later sought to protect, under Rule 9.01,

would not be discoverable by the defense. Rule 9.01, subdivision 3(2), states:

> *Prosecution Witnesses Under Prosecuting Attorney's Certificate.* The information relative to the witnesses and persons described in Rules 9.01, subd. 1(1), (2) [which includes the names, addresses, and prior records of witnesses] shall not be subject to disclosure if the prosecuting attorney files a written certificate with the trial court that to do so may subject such witnesses or persons or others to physical harm or coercion, provided, however, that *non-disclosure under this rule shall not extend beyond the time the witnesses or persons are sworn to testify at the trial.*

(Emphasis added.) During pretrial discussions on July 2, 1984, Hathaway's counsel challenged the constitutionality of Rule 9.01, subd. 3(2), stating:

> But on a mere certification of a prosecutor that a witness may be in some sort of jeopardy, that serves in and of itself to stop the discovery process. I would suggest to the Court that if the Court allows that certification process as a tool to prohibit further discovery by the defendants, it will deny my client, Guy Hathaway, a fair trial. * * * [H]ere we have a case of a gentleman, two gentlemen, charged with the most serious of crimes provided for in our statutory scheme of criminal law, and by a mere filing of a document, prohibits his lawyer to interview these people.

Hathaway was able to gather information regarding two of the witnesses covered by the state's Rule 9.01, subdivision 3(2), certificate. Because Dwyer and Leslie testified before a grand jury and at the trial of Timothy Eling in 1982, defendant had these statements before trial. On July 6, 1984, the state also filed a supplemental disclosure with defendant stating that, since the trial of Eling in 1982, witness Leslie had been convicted of "attempted escape" in Florida and that witness Dwyer had "out-of-state" charges of "robbery" and "armed criminal action" pending against him.

On July 17, 1984, Gustafson filed a motion, in which Hathaway joined, asking the court to compel the state to disclose the location of Dwyer and Leslie and the specific information surrounding the recent convictions and charges of the two witnesses. The defendants suggested that the court determine, in camera, whether any information regarding the recent criminal activity of Dwyer and Leslie could be used in their defense. The following day, July 18, 1984, the state gave defendants documents entitled "Disclosure Regarding William Dwyer" and "Disclosure George L. Leslie." Therein, the state noted that Dwyer was allegedly involved in a late-night holdup of a clerk in a hotel in another state and was charged with armed robbery and armed criminal activity. The document stated that Dwyer was arrested in California five days after defendants Hathaway and Gustafson were arrested and that, in order to avoid simultaneous proceedings in the two jurisdictions, Dwyer waived his right to a speedy trial on the robbery charges in California, thus making himself available to testify at the joint trial of Hathaway and Gustafson in Minnesota. Apart from the expense of his relocation to Minnesota for the trial of Hathaway and Gustafson, the state noted in this document that Dwyer was receiving no benefit from testifying. The state disclosed to defendants that Leslie was presently incarcerated in another state and that Leslie had requested, and that the state had agreed, that prison officials in the other jurisdiction be informed that Leslie was testifying for the State of Minnesota and as a result the computation for time off for good behavior should not be affected by his absence from his job in the prison.[3] In light of the supplemental disclosure by the state, the

---

Colleen Pillar, a girlfriend of defendant Gustafson's roommate in Colorado.

3. Records later obtained from Florida indicated that Leslie also pleaded nolo contendere to charges of burglary, armed robbery, and grand theft.

court denied defendants' motions for further disclosure.

■ Hathaway contends that under Rule 9.01, subdivision 3(2), once Dwyer and Leslie testified for the state, he had a right to discover any relevant information about their recent charges and convictions and that the trial court denied him access to such information when, after the two witnesses had testified, he requested disclosure of information concerning their recent charges and convictions. He argues that the trial court misinterpreted Rule 9.01, subdivision 3(2), thus violating the principle of discovery enunciated in *Jencks v. United States*, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957), as recognized by this court in *State v. Thompson*, 273 Minn. 1, 26–32, 139 N.W.2d 490, 508–12 (1966), and *State v. Grunau*, 273 Minn. 315, 322–29, 141 N.W.2d 815, 822–25 (1966).

In *Thompson*, we adopted the federal *Jencks* rule, stating:

We therefore now hold that after a witness testifies for the prosecution an accused person has the right to examine unprivileged pretrial statements of the witness for the purpose of determining whether he wishes to use it for impeachment purposes, without laying any further foundation than that such statement has been made. If the prosecution objects to the statement on the ground of relevancy, the court, in camera, will decide whether the statement is relevant; and if it finds that the whole or a part thereof is not relevant to the testimony of the witness, it shall excise such part as is not relevant, retaining it, however, as a part of the record so that upon review the correctness of the court's ruling may be determined.

273 Minn. at 31–32, 139 N.W.2d at 512 (footnote omitted).

It is not readily apparent from the transcripts what precisely Hathaway sought, after Dwyer and Leslie testified for the state, to have disclosed under the *Thompson* rule. Most likely, he wished to obtain any statements Dwyer might have made to the prosecutors in Minnesota, seeking their aid in attaining some leniency in plea negotiations in the jurisdiction in which he was being charged with armed robbery. Regarding any information defendant wanted disclosed about Leslie, who was at the time in prison in Florida, the transcript reads:

MR. OLKON [counsel for defendant Gustafson]: * * * I'm not trying to impugn their integrity or anything else, but we do have a man by the name of George Leslie testifying under oath now as to what the total charges are and what the dispositions are, and we are under a certificate of not being able to do any investigation, not being able to find out anything independently. * * * My motion dated the 17th of July asks for information, complaints, indictments. I think we've got a right to examine those documents and now compare it with Mr. Leslie's testimony to see if it's the same.

\* \* \* \* \* \*

MR. OLKON: Additionally, George Leslie testified, I believe, on Friday afternoon that he wrote letters to Sergeant Frank, two of them, as I recall, and one letter I believe, or maybe it was two, to—I don't believe it was to Mr. Widseth [counsel for the state]. I believe it was to Miss Bakken [the other counsel for the state]. I would like those letters. That should have been disclosed a long time ago. That was as to the potentiality of a deal.

\* \* \* \* \* \*

MR. STRAUSS: [counsel for defendant Hathaway]: We join in all those requests, Your Honor.

Rule 9.01, subdivision 3(2), and the comments thereto provide that information regarding witnesses that is protected by the rule is discoverable after the witnesses have testified, under the procedure laid down in *Thompson* and *Jencks*. The trial court therefore erred when it denied any discovery of the items after Leslie and Dwyer testified.

■ The error, however, is harmless. We noted in *Thompson* that although the

state should have disclosed information under the *Jencks* principle, no substantial prejudice to the defendant resulted because the trial court had examined the prior statement of the witness that should have been disclosed to the defendants and determined that it did not conflict with the witness' testimony on direct examination. 273 Minn. at 32, 139 N.W.2d at 512. The trial court in the case at bar did not examine any of the existing statements made by Dwyer and Leslie. Nevertheless, the harmless error rule is applicable because most of the statements made by the witnesses would have been inadmissible at trial. Hathaway sought disclosure of information regarding Dwyer's pending charges. Although prior convictions are regularly used to impeach a witness on cross-examination, Minn.R.Evid. 609 and Minn.R.Evid. 404(b) preclude the introduction of pending charges to impeach. Apparently Hathaway also sought information concerning Leslie's plea of nolo contendere to burglary, armed robbery and grand theft in Florida. Even if any such information existed and had been disclosed, as it should have been under *Thompson,* it would have been inadmissible at trial under Minn.R.Evid. 410, which explicitly excludes nolo contendere pleas. If the statements made by Leslie in his letters to the counsel for the state regarded immunity from prosecution or favorable plea negotiations in exchange for testifying, such evidence is admissible and typically brought out during cross-examination. The trial court's incorrect ruling under Rule 9.01 precluded any investigation into plea negotiations Leslie had. However, in light of the other available evidence with which the defendants were able to impeach, this error is harmless.

Apart from contending that the trial court's interpretation of Rule 9.01, subdivision 3(2), violated his right to disclosure under *Thompson,* Hathaway states that the rule, as written, is overly broad in that it allows a prosecutor to determine, without consideration by the trial court, that information regarding certain witnesses is undiscoverable. He notes that protection of such information can be achieved through the use of protective orders and in camera proceedings, provisions already existing in Minn.R.Crim.P. 9.03, subds. 5, 6. The trial court, under such provisions, determines the extent of protection needed—not the prosecutor.

■■ Rule 9.01, subdivision 3(2), does not violate any constitutional or statutory right of defendant. His right to obtain information after the witnesses have testified on direct examination at trial under *Thompson,* is not violated. The rule and comments thereto expressly provide for that disclosure. Moreover, the rule need not be interpreted as broadly as Hathaway contends. In filing a certificate with the court in the case at bar, the state noted:

> [T]he State of Minnesota hereby certifies to the Court that the addresses or location of three essential witnesses * * * cannot be disclosed without subjecting them to physical harm or coercion. Complete written statements of these witnesses have been provided to the defense. Police reports reflecting threats of violence and intimidation attempts made against these witnesses are contained in the district court file. Each of the named defendants have multiple felony convictions involving personal violence, injury or the use of weapons.

We hold that in future cases the trial court, upon certification by the prosecutor, make a record of the evidence presented by the prosecutor and the court's determination of its sufficiency before Rule 9.01, subdivision 3(2), is applied.

Hathaway further contends that Rule 9.01 precluded him from obtaining exculpatory evidence, a right he possesses under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1964). *Brady* mandates that the state in a criminal proceeding turn over all evidence requested by the defendant that is favorable to the defendant and that is material to either guilt or punishment. 373 U.S. at 87, 83 S.Ct. at 1196. Minn.R.Crim.P. 9.01, subd. 1(6), provides for the disclosure of such exculpatory

material before trial, in accordance with the due process demands expounded in *Brady*. By not being allowed to investigate the nolo contendere pleas entered by Leslie in Florida in 1984, Hathaway argues that he was precluded from obtaining possible exculpatory evidence, evidence that might have put blame for the 1982 hospital robbery on Leslie. Hathaway contends that because the August 1982 criminal actions of Leslie in Florida resembled the actions of the men who attempted to rob the hospital pharmacy in October 1982—both were robberies by armed individuals wearing ski masks—he had a right to investigate the Florida episode and to attempt to introduce the evidence to impeach Leslie on the stand.

Although under Minn.R.Crim.P. 9.01, subd. 1(6), Hathaway had a right to statements in possession of the state, if any, his inability to obtain such information does not rise to the level of a constitutional violation under *Brady*. The information under *Brady* must be not only favorable to the defendant, which arguably the information Hathaway seeks is, but also material to the defendant's guilt or punishment. *United States v. Agurs*, 427 U.S. 97, 104, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976); *Brady*, 373 U.S. at 87, 83 S.Ct. at 1196; *see also, United States v. Bagley*, — U.S. ——, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985) (discussing materiality under *Brady*). Under the Minnesota Rules of Evidence, Hathaway would have difficulty in even introducing any statements made by Leslie, assuming any exist and that they are relevant. Rule 404(a) would appear to preclude the introduction of any of the Florida statements to show that Leslie was one of the three men who attempted to rob the hospital pharmacy in 1982. Admissibility under Rule 404(b) would also be difficult to achieve, and Rule 410 expressly precludes the admissibility of nolo contendere pleas in any subsequent proceeding. The materiality of possible statements made by Leslie in Florida appears to be too speculative for *Brady* to apply. *See State v. Hyleck*, 286 Minn. 126, 144–45, 175 N.W.2d 163, 174–75,

*cert. denied*, 399 U.S. 932, 90 S.Ct. 2267, 26 L.Ed.2d 803 (1970).

3. Hathaway argues that the photo display presented by police to hospital employees Brisson, McDuffey and Tasler, all of whom testified at trial, was suggestive and unreliable. The test for determining whether a pretrial identification procedure violates a defendant's due process rights is whether, under the totality of the circumstances, such procedures are "so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Neil v. Biggers*, 409 U.S. 188, 197, 93 S.Ct. 375, 381, 34 L.Ed.2d 401 (1972), *quoting Simmons v. United States*, 390 U.S. 377, 384, 88 S.Ct. 967, 971, 19 L.Ed.2d 1247 (1968). The factors to be considered include the opportunity of the witness to view the suspect, the witness' degree of attention, the accuracy of any description of the criminal prior to the identification procedure, the level of certainty demonstrated by the witness at the time of the identification procedure, and the time between the crime and the identification procedure. *See Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977); *Biggers*, 409 U.S. at 199–200, 93 S.Ct. at 382; *see also State v. Heinkel*, 322 N.W.2d 322, 325 (Minn.1982) (discussing the factors to be considered).

In prior decisions, we noted that, despite defective identification procedures, the procedures were constitutional because the witnesses were certain in their identification or precise in their pre-identification description. *See State v. Webber*, 292 N.W.2d 5, 11 (Minn.1980); *State v. Brouillette*, 286 N.W.2d 702, 707 (Minn.1979); *State v. Peterson*, 262 N.W.2d 706, 707 (Minn.1978).

■ Although not precise, the pre-identification descriptions given by the hospital employees were ultimately established by police investigation. Upon reviewing the totality of the circumstances surrounding the pretrial identifications in this case, sufficient protections exist. A "substantial likelihood of irreparable misidentification" did not occur.

4. Hathaway argues that he was prejudiced by the introduction of a photo of the victim in a police uniform. The photo was used by the state in examining at least six witnesses. Hathaway's concerns resemble those discussed in *State v. Plan*, 316 N.W.2d 727, 728 (Minn.1982), in which we held that references to the fact that the victim was a son of a police officer in the prosecutor's opening statement and direct examination of two witnesses were not inflammatory. In light of all the other evidence admitted, the introduction of the victim's photo in this case was "unlikely to have played a substantial part in influencing the jury's verdict." *State v. Spaulding*, 296 N.W.2d 870, 876 (Minn.1980).

5. When determining whether the evidence in a criminal case was sufficient to permit the jury to render the verdict it did, we examine the evidence in the light most favorable to the verdict. *See State v. Oevering*, 268 N.W.2d 68, 71 (Minn.1978). The court will not disturb a verdict if the jury could reasonably have concluded that the defendant was proven guilty of the charges, provided that the jury acted in recognition of the presumption of innocence and the beyond-a-reasonable-doubt standard. *See State v. McCullum*, 289 N.W.2d 89, 91 (Minn.1979), *citing State v. Norgaard*, 272 Minn. 48, 52, 136 N.W.2d 628, 632 (1965).

Substantial evidence existed in this case. Two coconspirators testified in detail about the plans by Hathaway to rob the hospital pharmacy. Denise Loftus testified to purchasing a "throwaway" car and implicated Hathaway in that plan. Three hospital employees testified that they saw a man fitting Hathaway's description in the hospital a few days before the shooting. The hospital operating engineer, phamacist, and pharmacy technician testified to the descriptions of the three men who attempted to rob the pharmacy. From this evidence the jury reasonably determined that Hathaway was guilty of the offenses of which he was convicted.

Affirmed.

PETERSON, J., took no part in the consideration or decision of this case.