STATE of Minnesota, Respondent,

v.

Robert M. HUGHES, Appellant.

No. A07–144.

Supreme Court of Minnesota.

May 22, 2008.

John B. Galus, Assistant Attorney General, St. Paul, MN, for Respondent.

Lydia Maria Villalva Lijo, Assistant State Public Defender, St. Paul, MN, for Appellant.

## OPINION

GILDEA, Justice.

Following a jury trial in Freeborn County District Court, appellant Robert Michael Hughes was convicted of first-degree premeditated murder and second-degree intentional murder for the shooting death of his wife, Tammy Hughes. Appellant filed a direct appeal to this court, arguing that the evidence presented at trial was insufficient to prove the element of premeditation beyond a reasonable doubt, and that the district court's jury instructions regarding first-degree premeditated murder and second-degree intentional murder constituted plain error that entitles him to a new trial. Appellant also presents additional arguments in a pro se supplemental brief. We affirm.

The evidence at trial showed that appellant and Tammy Hughes married in 1996 and that they had two children. The family lived in Albert Lea, Minnesota. At trial, the State presented evidence showing that the couple's marriage had deteriorated in the weeks preceding Tammy's death. As a result, Tammy separated from appellant on May 20, 2005, and on May 23, she contacted an attorney to begin dissolution proceedings.

The evidence showed that appellant was distraught over Tammy's decision to leave.

On May 24, the day before the shooting, appellant lunched with his former employer, who described appellant as "very distraught," crying, hunched over, and mumbling. During their lunch, appellant said that he and Tammy had discussed their children and marriage that day, and that "he was very concerned that she was going to take the kids away from him." Appellant also spoke for 2–and–a–half hours with a childhood friend that same day. During this conversation, appellant became so upset that the friend asked if he was having thoughts of suicide. That night, appellant spoke to Tammy's mother and said that "he wanted to know what he could do" to get Tammy back; Tammy's mother told appellant that the relationship was over.

The next day, May 25, Tammy met with her attorney at 8 a.m. She indicated during their conversation that she wanted custody of the couple's two young children who, at the time, were staying in the family home with appellant. She informed her attorney that she planned to obtain paperwork and information from appellant over the noon lunch hour and gauge his reaction regarding the custody situation.

Tammy left the meeting with her attorney and went to work. Her coworkers reported that she was "in a pretty good mood" when she arrived at the office. The staff ordered pizza to be delivered for lunch between 12:15 and 12:30 p.m. that day, and a coworker tried to persuade Tammy to stay for it. But after phoning appellant, Tammy told her coworker, "I have to go right now, * * * he's in a giving mood and I don't want to agitate him, and he was very adamant, he said you have to come right now, right now, I'm going to be busy at one o'clock." Tammy left the office at 11:45 a.m.

The State offered testimony from two of the Hugheses' neighbors that they heard shots fired around noon on May 25. J.D., the next-door neighbor, testified that two shots were fired within 30 seconds to 1 minute of each other. J.D. said that 5 minutes after the second shot, she heard the tires squealing on appellant's van, and looked out her window to see appellant driving away from the house. K.K., who lived across the street and knew that the couple was having marital problems, testified that the shots were probably fired within a 5–minute span. In response to the noise, K.K. looked out her window and saw appellant "running out of his house." She saw him jump in his van, back up out of the driveway, almost hit a car in the street, and then tear off. K.K. also saw Tammy's van parked on the street. She phoned the police when Tammy failed to come out of the house. K.K. testified that 10 to 15 minutes after appellant left, he "just pulled in the driveway like nothing was wrong" and "unlocked the front door and just walked in."

Albert Lea police officers arrived at the Hughes home shortly after noon in response to K.K.'s call. They entered through the front door and went into the living room, where they found Tammy's body on the floor. She had suffered two shotgun wounds, and was dead when police arrived. Police found a spent shotgun cartridge casing located near Tammy's right leg and another near the entry to the kitchen. A 12–gauge pump shotgun was propped against the kitchen wall.

Police discovered appellant in the backyard near a fire pit, where a fire had just started to burn. He was holding a torch attached to a propane tank, and a gas can was nearby. Appellant was crying and "wailing loudly" when officers apprehended him, but he was cooperative during the arrest. Because of his behavior, police had appellant taken to the local hospital

for examination. Appellant cried and sobbed during the drive to the hospital.

Appellant's emergency room nurse described him as oriented and cooperative during his examination. He was moaning with his eyes closed and making facial grimaces, but did not cry. While at the hospital, appellant said to a detective "that he was sorry he screwed up." His nurse confirmed that appellant said, "I'm sorry, I messed up, I'm sorry," and that he volunteered this comment without being asked to do anything or answer any questions. Medical personnel found nothing physically wrong with appellant. Police observed no blood on his hands, arms, or clothes at the hospital, and no bloody clothes were found at the house.

Dr. Kelly Mills, who performed the autopsy on Tammy's body, explained at trial that Tammy was shot twice and that she sustained three different injuries as a result. Tammy was shot first in the back, through her left shoulder area. The second shot came from the front and entered Tammy's body through her left breast. Dr. Mills testified that the first shot to Tammy's back was the fatal shot, and that it would have taken between 1 to 2 and 10 to 20 minutes for Tammy to die after that shot. Between the first and second shots, Tammy would have made raspy or "gurgling respiratory sounds" as she tried to breathe and her blood mixed with the air. Based on the nature of the second injury, Dr. Mills said that Tammy was alive at the time of the second shot. The second shot sped her death and Tammy either died on her back or was turned over onto her back shortly after death.

The State also presented forensic evidence. Forensic scientist and firearms examiner Stephanie Eckerman testified that the muzzle of the shotgun was 6 to 12 feet away when Tammy was shot in the back, and that the muzzle of the shotgun was 1 foot to 2 feet away from Tammy when she was shot in the left breast. Bureau of Criminal Apprehension forensic scientist Glenn Langenburg analyzed blood spatter in the living room of the Hughes house. He testified that Tammy was kneeling or crouching when she was shot and that her back was toward the kitchen and her face toward the cabinets along the wall of the living room. Finally, regarding forensics, Eckerman confirmed that the two shells that were found on the floor of the Hughes home—one in the living room and one in the kitchen—were fired by the shotgun police found propped up against the wall in the kitchen.

The State presented evidence that appellant purchased the 12–gauge shotgun on January 31, 2004, and that he typically stored it in the basement of the home. A neighbor and friend of appellant's testified that he was in the Hughes home "[a] thousand" times during the 5 years that he lived across the street from them. He was with appellant when he bought the shotgun, and said that the shotgun was upstairs for a week or so after appellant first purchased it; after that he only saw the shotgun upstairs when the two men were going out shooting.[1]

The jury found appellant guilty of first-degree premeditated murder and second-degree intentional murder. The district court convicted appellant of first-degree murder and sentenced him to life in prison. This direct appeal followed.

---

1. A detective found an empty gun case and many boxes of shotgun shells behind some clothing in the corner of the closet attached to the downstairs bedroom. The gun case belonged to the shotgun used to kill Tammy. No weapons or shells were found elsewhere in the house.

## I.

■ We turn first to appellant's argument that the evidence presented at trial was insufficient to prove the element of premeditation. When the question is the sufficiency of evidence, "we view the evidence in the light most favorable to the State and will assume that the jury believed the State's witnesses and disbelieved contrary evidence." *State v. Moore*, 481 N.W.2d 355, 360 (Minn.1992). The issue on appeal is whether the facts in the record and the legitimate inferences drawn from them would permit the jury to reasonably conclude that appellant was guilty beyond a reasonable doubt of first-degree premeditated murder. The jury is in the best position to weigh the credibility of the evidence and thus determine which witnesses to believe and how much weight to give their testimony. *Id.*

■ The jury found appellant guilty of premeditating the murder of his wife. Minnesota Statutes § 609.185(a)(1) (2006) provides that whoever "causes the death of a human being with premeditation and with intent to effect the death of the person or of another" is guilty of first-degree murder. First-degree murder is distinguished from second-degree intentional murder because of the element of premeditation. *State v. Leake*, 699 N.W.2d 312, 326 n. 10 (Minn.2005); *see* Minn.Stat. § 609.19, subd. 1(1) (2006). Premeditation means "to consider, plan or prepare for, or determine to commit, the act * * * prior to its commission." Minn.Stat. § 609.18 (2006). While "[a] finding of premeditation does not require proof of extensive planning or preparation to kill," or "require any specific period of time for delib-

eration," *State v. Cooper*, 561 N.W.2d 175, 180 (Minn.1997), the State "must prove that *some appreciable period of time* passed after the defendant formed the intent to kill, during which the statutorily required consideration, planning, preparation, or determination took place," *State v. Moua*, 678 N.W.2d 29, 39 (Minn.2004) (emphasis added).[2] Because it "is a state of mind," premeditation is "generally proven through circumstantial evidence," and is often inferred from the totality of circumstances surrounding the killing. *Leake*, 699 N.W.2d at 319, 321; *see also State v. Buchanan*, 431 N.W.2d 542, 547 (Minn. 1988).

■ Appellant's argument that the evidence of premeditation was insufficient is premised on the fact that the State relied on circumstantial evidence to prove premeditation in this case. Circumstantial evidence receives "the same weight as any other evidence so long as the circumstances proved are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Leake*, 699 N.W.2d at 319. But appellant argues that the State was required to present circumstantial evidence that pointed "inescapably" to his guilt. In support of his argument, appellant relies on *Bernhardt v. State*, 684 N.W.2d 465 (Minn.2004), and *State v. Swain*, 269 N.W.2d 707 (Minn.1978). These cases do not support the conclusion that the State's burden in a circumstantial evidence case is something more than proof beyond all reasonable doubt.

In *Bernhardt*, the defendant was in custody at the time of the murder and the

---

**2.** The State contends that premeditation may occur "virtually instantaneously." We said in *State v. Buchanan*, 431 N.W.2d 542, 547 (Minn.1988), that "[t]he requisite plan [for premeditation] can be formed * * * virtually instantaneously." But we have since rejected

such a standard as "blur[ring] the line between first and second degree murder," and have noted that premeditation "requires some amount of time to pass between formation of the intent and the carrying out of the act." *Moore*, 481 N.W.2d at 360.

issue was whether he directed others to commit the murder. 684 N.W.2d at 469–71, 477–78. We said that while the evidence was consistent with the State's theory that the defendant had directed the murder, the evidence was also consistent with the "rational hypothesis" that an acquaintance, who had "openly talked about the possibility of murdering [the victim]," had directed the murder. *Id.* at 478. In addition, we concluded that the evidence was also consistent with the reasonable hypothesis that the group that committed the murder had acted alone. *Id.* Because the State's evidence did not exclude what we termed these "other rational hypotheses," we reversed. *Id.* at 479.

Similarly, in *Swain,* we reversed a conviction for premeditated murder. 269 N.W.2d at 714. The State argued that premeditation was proven because the defendant had threatened to kill the victim, hit her repeatedly, and struck her from behind. *Id.* at 713. We held that the threat was too remote, having been made 10 months before the murder, to be probative of a plan to murder. *Id.* We also said that "the fact that [the victim] was struck from behind does not lead to the inference of planning. It is just as likely that she was struck impulsively as she turned her back." *Id.* Finally, we held that the fact that the victim was struck multiple times was not sufficient by itself to support an inference of premeditation where there was no evidence presented of "prior planning" activity. *Id.* at 713–14. In reversing the conviction, we applied the rule recognized above, that in a circumstantial evidence case, "all the circumstances proved must be consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis except that of his guilt." *Id.* at 712.

■ As these cases recognize, the State's burden is not to remove *all* doubt,

but to remove all *reasonable* doubt. *See State v. Taylor,* 650 N.W.2d 190, 206 (Minn.2002) (quoting *State v. Ostrem,* 535 N.W.2d 916, 923 (Minn.1995) for the proposition that "possibilities of innocence do not require reversal of a jury verdict so long as the evidence taken as a whole makes such theories seem unreasonable"). We apply the same rule in this case and examine the circumstantial evidence in accord with the three categories of evidence our precedent recognizes as relevant to an inference of premeditation: planning activity, motive, and the nature of the killing. *Moore,* 481 N.W.2d at 361.

### A. Planning Activity

■ Premeditation may be shown by evidence that the defendant planned his attack. Planning activity concerns "facts about how and what the defendant did prior to the actual killing which show he was engaged in activity directed toward the killing." *Moore,* 481 N.W.2d at 361 (internal quotation omitted). It includes prior possession of the murder weapon by the defendant, sneaking up on the prospective victim, or taking the prospective victim to a location where others are unlikely to intrude. *Id.; see also State v. Flores,* 418 N.W.2d 150, 158 (Minn.1988) (stating that retrieving the gun between an altercation with the victim and the shooting, as well as pausing between shots, indicated planning). The State argues that appellant's decision to retrieve the shotgun from storage in the basement is evidence of planning activity. We have recognized in several cases that procurement of a weapon constitutes evidence of premeditation. *See, e.g., Bangert v. State,* 282 N.W.2d 540, 544 (Minn.1979) (stating that premeditation includes procuring a firearm from another part of the house and walking down a hallway to kill the victim); *State v. Merrill,* 274 N.W.2d 99, 112 (Minn.1978) (stat-

ing that the defendant's "actions in going into the kitchen, obtaining the knife, returning to the bedroom, and stabbing the victim numerous times reasonably impl[ed] that he had determined to kill [the victim]").[3]

Appellant argues that notwithstanding the authorities discussed above, his possession of the shotgun for recreational purposes is irrelevant to the determination of premeditation and that the State failed to present evidence about precisely when the shotgun was moved upstairs and loaded. But the State presented evidence that appellant kept the shotgun in his basement closet. The State also proved that appellant knew in advance that Tammy was coming over to the house. In fact, appellant insisted that Tammy come to the house right away after her call. From this evidence, the jury could infer that after appellant directed Tammy to come right over to the house, he retrieved the shotgun from the basement. The evidence therefore is consistent with planning activity.

### B. Motive

■ Motive may be inferred from the defendant's prior relationship and conduct with the victim. *Moore*, 481 N.W.2d at 361. Such evidence includes "prior threats by the defendant to do violence to the victim, plans or desires of the defendant which would be facilitated by the death of the victim, and prior conduct of the victim known to have angered the defendant."

*Id.* (internal quotation omitted); *see, e.g., State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn.1995) (stating that the deterioration of the couple's marriage, an argument between the defendant and victim the night before the killing, and the defendant's anger toward the victim provided evidence of premeditation). Although there was no evidence of physical abuse and appellant made no threats to Tammy's safety, the State presented evidence that appellant and Tammy's marriage had deteriorated to the point of divorce; appellant was distraught about their separation and said that divorce was not an option for the couple; appellant was fearful that the divorce would lead to his loss of custody of the children; and Tammy planned to discuss child custody arrangements with appellant when she went to the house the day of her murder. That evidence provides a basis for the jury to infer that appellant's motive for killing his wife was to prevent her from leaving him and taking the children.

### C. Nature of the Killing

■ Finally, premeditation may be shown through evidence of the nature of the killing itself. From such evidence that "the manner of [the] killing was so particular and exacting," the jury may infer "that the defendant must have intentionally killed according to a preconceived design." *Moore*, 481 N.W.2d at 361 (internal quota-

---

**3.** *See also State v. Chomnarith*, 654 N.W.2d 660, 665 (Minn.2003) (finding premeditation existed where the defendant "obtained an industrial grade meat-cutting knife from the residence" before going to the "mouth of the driveway" and stabbing the victim to death); *State v. Lodermeier*, 539 N.W.2d 396, 398 (Minn.1995) (finding premeditation existed where the defendant removed the handgun from the nightstand drawer and then from its zippered case before shooting his wife); *Moore*, 481 N.W.2d at 361 (finding the fact that the defendant "removed the shotgun from its normal storage place under the bed, loaded it, and placed it on the shelf in the living room early on the day of the killing support[ed] an inference that [the] defendant planned earlier in the day to use the gun later"); *Bangert v. State*, 282 N.W.2d 540, 544 (Minn.1979) (finding premeditation where the defendant procured a rifle, walked down the hallway, took careful aim, and pulled the trigger three times).

tion omitted). Such "evidence includes the number of wounds inflicted, infliction of wounds to vital areas, infliction of gunshot wounds from close range, passage of time between infliction of wounds, and a defendant's concern with escape rather than with rendering aid to the victim." *State v. McArthur,* 730 N.W.2d 44, 50 (Minn.2007) (concluding there was sufficient evidence of premeditation where the victim was shot from behind, in the head, and from a distance of 12 inches or less).[4]

In this case, the evidence showed that Tammy was first shot in the back, while crouched or kneeling, and then shot at close range in the chest—both vital areas of the body. The shotgun was close to Tammy's body when she was shot. An appreciable period of time—up to 5 minutes—elapsed between the first and second shots. Instead of rendering aid to Tammy, neighbors observed appellant fleeing quickly from the house within minutes of the shots. The nature of the killing and appellant's behavior after the shooting support an inference of premeditation.

In sum, when we consider the evidence of appellant's planning and motive and the evidence as to the nature of the killing, it is clear that the circumstantial evidence established beyond all reasonable doubt that appellant premeditated the murder. We therefore hold that the evidence was sufficient to prove the element of premeditation.

## II.

 We turn next to appellant's argument that the district court erred by giving incomplete jury instructions on first-degree premeditated murder and second-degree intentional murder. Appellant concedes that he did not offer specific instructions that the court refused to give or object to the instructions given at trial. These failures generally constitute waiver of the right to appeal. *State v. Cross,* 577 N.W.2d 721, 726 (Minn.1998). Nevertheless, we may consider a plain error not previously brought to the attention of the district court if the error affects substantial rights. Minn. R.Crim. P. 31.02; *see also State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998). Before we review unobjected-to error, "there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights." *Griller,* 583 N.W.2d at 740. If these three prongs are met, we "then assess[ ] whether [we] should address the error to ensure fairness and the integrity of the judicial proceedings." *Id.*

### A. *CRIMJIG 11.02, Instruction on First–Degree Premeditated Murder*

 Appellant contends that the district court erred by omitting the last paragraph of CRIMJIG 11.02. The paragraph that was not given provides:

If you have a reasonable doubt that there was premeditation, but you find that all the other elements have been proven, then the defendant is guilty of murder in the second degree. The crime of murder in the second degree differs from murder in the first degree only in that the killing was done with

4. *See also State v. Goodloe,* 718 N.W.2d 413, 419–20 (Minn.2006) (finding premeditation where the victim sustained three gunshot wounds to the head, one of which was inflicted from no more than 4 feet away); *Chomnarith,* 654 N.W.2d at 665 (finding premeditation where the defendant "obtained an industrial grade meat-cutting knife from the residence and had it with him at the mouth of the driveway where he inflicted precise wounds to vital areas of [the victim's] body, including puncturing the lung, penetrating a rib bone, and transecting the subclavian artery"); *Lodermeier,* 539 N.W.2d at 398 (finding that evidence that there was a significant pause between shots and two of the three shots were fatal and fired at close range supported an inference of premeditation).

intent to kill another person but not with premeditation. If you find that any element other than premeditation has not been proven beyond a reasonable doubt, the defendant is not guilty of murder.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal,* CRIMJIG 11.02 (5th ed.2006).

 Under the first and second *Griller* prongs, we determine whether the district court committed error that was plain by omitting the instruction. 583 N.W.2d at 740. When reviewing jury instructions, error exists "if the instructions confuse, mislead, or materially misstate the law." *State v. Smith,* 674 N.W.2d 398, 401–02 (Minn.2004); *see Griller,* 583 N.W.2d at 740. We analyze the district court's instructions "with the understanding that trial courts possess significant discretion in the selection of instruction language and that instructions must be read as a whole to determine whether they accurately describe the law." *Smith,* 674 N.W.2d at 402.

Appellant argues that the district court was required to read the last paragraph of CRIMJIG 11.02. He relies on a comment to the JIG to support his argument: "The charge as to the lesser offense of murder in the second degree has been included because under the decision in *State v. Hyleck,* [286 Minn. 126, 175 N.W.2d 163 (1970)], it seems there are few cases in which murder in the second degree is not a lesser-included offense." CRIMJIG 11.02 cmt. But the defendant in *Hyleck* argued *against* the inclusion of a lesser-included offense instruction. 286 Minn. at 139, 175 N.W.2d at 172. He was indicted only for first-degree murder, but convicted of second-degree murder. *Id.,* 175 N.W.2d at 172. He argued that it was improper for the trial judge to submit the lesser charge to the jury, and that "the jury should have been allowed to find him guilty or not guilty of first-degree murder only." *Id.* at

140, 175 N.W.2d at 172. We said that if "there was evidence from which a jury could find that defendant killed his wife with intent but without premeditation, the submission of an instruction covering second-degree murder was *proper.*" *Id.* at 139, 175 N.W.2d at 172 (emphasis added).

 While we have recognized that the use of the CRIMJIGs is favored, "their use is not mandatory." *Smith,* 674 N.W.2d at 401. The district court's failure to give the entire CRIMJIG does not necessarily mean that the court erred, much less committed error that was plain. Unlike in *Hyleck,* appellant was charged with both first- and second-degree murder. Appellant concedes that the district court properly instructed the jury on the elements of second-degree murder, but hinges his argument on the court's failure to emphasize that premeditation is—as appellant characterizes it—the "critical distinction" between the two murder charges. But the court did emphasize the distinction between first- and second-degree murder when it told the jury that for second-degree murder, "[i]t is not necessary that the defendant's act be premeditated." The court also told the jury to consider the charges separately. Finally, the court stressed the State's burden by saying that the jury must find appellant not guilty if the State failed to prove any of the elements of first-degree murder.

The district court cannot be said to have confused or materially misstated the law when it omitted the last paragraph of CRIMJIG 11.02. We therefore hold that appellant did not prove that the district court committed plain error when it did not give the last paragraph of CRIMJIG 11.02 as part of its instructions to the jury.

### B. CRIMJIG 3.20, Pattern Jury Instruction on Lesser Crimes

 Appellant also argues that the district court erred by failing to instruct the

jury regarding lesser crimes, as provided in CRIMJIG 3.20, which provides:

> The law provides that upon the prosecution of a person for a crime, if the person is not guilty of that crime, the person may be guilty of a lesser crime.
>
> (A) (The) lesser crime(s) in this case (is)(are): _____.
>
> The presumption of innocence and the requirement of proof beyond a reasonable doubt apply to these lesser crimes. If you find beyond a reasonable doubt that the defendant has committed each element of the lesser crime, but you have a reasonable doubt about any different element of the greater crime, the defendant is guilty only of the lesser crime.

10 Minn. Dist. Judges Ass'n, *Minnesota Practice—Jury Instruction Guides, Criminal*, CRIMJIG 3.20 (5th ed.2006). Because the court did not give CRIMJIG 3.20, appellant argues that "the jury was not clearly instructed that second-degree murder was a lesser offense" of first-degree murder.

We first consider whether it was plain error for the district court to fail to sua sponte read CRIMJIG 3.20. *Griller*, 583 N.W.2d at 740. The jury instructions must adequately state the law, and appellant concedes that the district court properly instructed the jury as to the elements of first- and second-degree murder. Thus, unless we have required district courts to sua sponte read CRIMJIG 3.20 when instructing a jury as to first- and second-degree murder, there is no plain error here. *Cf. State v. Reed*, 737 N.W.2d 572, 584 (Minn.2007) (stating that because a district court is required by case law to sua sponte deliver an accomplice corroboration instruction to the jury, failure to give it was error which was plain).

Appellant relies on *State v. Bolte*, 530 N.W.2d 191 (Minn.1995), to support his argument that the district court was required to read CRIMJIG 3.20 in this case. The defendant in *Bolte* was convicted of both premeditated first-degree murder and intentional second-degree murder. *Id.* at 193. The district court read the full CRIMJIG 11.02, but not CRIMJIG 3.20. *Id.* at 199. Defense counsel did not request CRIMJIG 3.20, and we held that the trial court did not commit plain error by failing to sua sponte read the instruction because the court "expressly instructed the jury pursuant to CRIMJIG 11.02, that if it had a reasonable doubt on the issue of premeditation, but found that all the other elements of premeditated murder were present, the jury should find [the] defendant guilty of second-degree intentional murder." *Id.* We agreed with the comment to CRIMJIG 3.20 that " '[i]n appropriate cases it may be necessary to use this instruction even though the lesser-included offenses are charged as counts in the complaint.' " *Id.* (quoting CRIMJIG 3.20 cmt.). But the *Bolte* court did not require district courts to read the last paragraph of CRIMJIG 11.02 and/or CRIMJIG 3.20 when instructing a jury as to first- and second-degree murder. *Cf. State v. Fields*, 730 N.W.2d 777, 784 (Minn. 2007) (holding that prosecutorial error was not established because prior case law "did not clearly indicate that failure to satisfy its procedural requirements * * * would result in the evidence being ruled inadmissible").

When read in their entirety, the district court's instructions accurately described the elements of first- and second-degree murder. The court also highlighted the distinction between the two murder charges and emphasized the State's burden of proof. Finally, the court instructed the jury that if the jury found that the State did not meet its burden of proof on any element of a charge, that the jury's

verdict as to that charge must be not guilty. Under these circumstances, we hold that appellant did not show that the court committed plain error in failing to sua sponte read CRIMJIG 3.20.

## III.

Appellant raises additional issues in his pro se brief, which include: (1) ineffective assistance of counsel/access to the courts; (2) invalid warrantless search of the Hughes home; (3) violation of his *Miranda* rights; (4) erroneously admitted relationship evidence regarding "controlling" behavior; (5) inflammatory firearms demonstration by Stephanie Eckerman in the courtroom; (6) legally inconsistent convictions for both first- and second-degree murder; (7) incorrect sentence;[5] and (8) reasonableness of the restitution award. The record before us does not include information about the restitution award. Accordingly, we deny that claim without prejudice to appellant's ability to pursue it on postconviction. We have carefully considered all of appellant's other pro se claims and hold that they are without merit.

Affirmed.

DIETZEN, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

---

**5.** Appellant claims that the district court incorrectly imposed a life sentence without the possibility of parole. The district court convicted appellant under Minn.Stat. § 609.185(a)(1), and sentenced him to "life imprisonment." At sentencing, the district court said, "you will be committed to the Commissioner of Corrections * * * for the rest of your life." The 2005 legislature amended Minn.Stat. § 609.106, subd. 2—the

statute mandating a life sentence without possibility of release for certain crimes—to include violations of Minn.Stat. § 609.185(a)(1). Act of June 2, 2005, ch. 136, art. 17, § 9, 2005 Minn. Laws 1120, 1127. That amendment became effective on August 1, 2005, and applies to crimes committed on or after that date. Because Tammy was killed before that date, the amended statute does not apply.