Robert Michael HUGHES,
petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. A11–0472.

Supreme Court of Minnesota.

April 25, 2012.

Rehearing Denied July 3, 2012.

Robert Michael Hughes, Bayport, MN, pro se.

Lori Swanson, Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN; and Craig S. Nelson, Freeborn County Attorney, Albert Lea, MN, for respondent.

## OPINION

PAGE, Justice.

In October 2006 appellant Robert Michael Hughes was convicted of first-degree premeditated murder, in violation of Minn. Stat. § 609.185(a)(1) (2010), for the shooting death of his wife, Tammy Hughes. The trial court imposed the mandatory sentence of life imprisonment with the possibility of parole. Hughes was also ordered to pay restitution in the amount of

$6,771.78 to the Crime Victims Reparations Board. We affirmed Hughes's conviction on direct appeal. *State v. Hughes,* 749 N.W.2d 307 (Minn.2008).

On November 8, 2010, Hughes filed a petition for postconviction relief. While the petition is not entirely clear, we read it as raising 18 claims.[1] The two most significant claims are (1) the trial court's restitution order was improper because the restitution request lacked specificity, he was not responsible for his wife's death, his wife did not incur any out-of-pocket expenses, and he did not receive due process with respect to the request; and (2) the Confrontation Clause was violated by the introduction at trial of statements made by his wife.[2]

The postconviction court denied Hughes's petition without a hearing, concluding that all of his claims were procedurally barred because they were either raised on direct appeal or were known but not raised on direct appeal. As to Hughes's Confrontation Clause claim, the postconviction court also concluded that

Hughes was not entitled to relief because Hughes did not identify any testimonial statements that were introduced against him at trial. For the reasons discussed below, we affirm.

I.

■ A postconviction court must hold an evidentiary hearing unless "the petitioner fails to allege facts sufficient to entitle him to relief." *Laine v. State,* 786 N.W.2d 635, 637 (Minn.2010). Mere "argumentative assertions without factual support" are not sufficient to require an evidentiary hearing. *Id.* (quoting *Rainer v. State,* 566 N.W.2d 692, 695 (Minn.1997)) (internal quotation marks omitted).

Minnesota Statutes § 590.01 governs the grounds for relief a convicted person may assert in a petition for postconviction relief. For a party who has had a direct appeal—as Hughes has—the petition "may not be based on grounds that could have been raised on direct appeal of the conviction or sentence." Minn.Stat. § 590.01, subd. 1 (2010); *see also State v. Knaffla,*

1. We do not consider here any issues that Hughes raised in his postconviction petition but did not discuss in his current brief to our court. *Powers v. State,* 688 N.W.2d 559, 560 n. 1 (Minn.2004) ("Issues raised in a petition for postconviction relief but not addressed by a party's brief are considered waived.").

2. Hughes's remaining 16 claims are: (1) there was insufficient evidence to support the premeditation element of first-degree murder; (2) a county sheriff was improperly placed near Hughes during the trial; (3) false testimony by law enforcement officers was used to justify an otherwise unlawful warrantless search; (4) Hughes's conviction cannot stand because he was either not competent at the time he killed his wife or, alternatively, he was never "determined to be competent" at the time he killed his wife; (5) his conviction cannot stand because he was not competent during his pretrial detention; (6) before trial, his property was illegally seized and released to a third party, thereby inhibiting his access

to the court; (7) there was insufficient evidence to otherwise support his conviction; (8) the passions of the jury were inflamed against him when a witness for the State conducted a demonstration using a shotgun; (9) the trial court failed to include particular jury instructions; (10) he was unlawfully convicted of two crimes arising out of the same conduct/behavioral incident; (11) expert testimony regarding matching shell casings was admitted in error; (12) he was denied access to legal documents, infringing on his constitutional right to due process and access to the courts; (13) exculpatory evidence was withheld by the State; (14) coerced, involuntary statements were introduced at trial along with statements taken in violation of *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966); (15) improper relationship evidence, hearsay, and character evidence was introduced at trial; and (16) he was improperly sentenced to life without parole.

309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976).

## II.

We first address Hughes's argument that he was improperly ordered to pay restitution. Specifically, Hughes claims that: (1) the restitution request lacked specificity; (2) Hughes was not responsible for his wife's death; (3) his wife did not incur any out-of-pocket expenses; and (4) he did not receive due process in opposing the request.[3]

Although Hughes appealed the trial court's restitution order on direct appeal and we denied relief, we indicated that Hughes could raise his restitution claims in a subsequent petition for postconviction relief. *State v. Hughes,* 749 N.W.2d 307, 318 (Minn.2008). On that basis, we conclude that the postconviction court erred when it found that Hughes's restitution claims were procedurally barred because they had been raised on direct appeal. Although we would ordinarily remand for further proceedings in the postconviction court, we conclude that, in light of the specific facts of this case, the interests of judicial economy will be served by our consideration of the merits of Hughes's restitution claims.

■ Restitution is governed by Minn. Stat. §§ 611A.04–.045 (2010). Once restitution is requested, "[t]he court ... shall request information from the victim to determine the amount of restitution owed." Minn.Stat. § 611A.04, subd. 1(a). The statute requires, "if restitution is in the form of money or property," the information must include an itemization and description of the loss and reasons justifying

the amounts claimed. *Id.* An offender may request a hearing to challenge the request for restitution but has the burden to produce evidence challenging requested items of restitution and/or the amount of requested restitution. Minn.Stat. § 611A.045, subd. 3. The record must "provide a factual basis for the restitution award." *State v. Fader,* 358 N.W.2d 42, 48 (Minn.1984).

The trial court's restitution order required Hughes to pay $6,771.78 for his wife's funeral expenses. Hughes argues that the restitution request for funeral expenses lacked specificity. He does not, however, identify in what way the request lacked specificity. Based on our review of the record, we conclude there is ample evidence to support a finding that the request for funeral expenses was sufficiently specific. The record indicates that the trial court explicitly deducted $145 for transportation expenses and $125 for a charitable donation from the restitution request. The trial court would not have deducted these expenses without an itemized restitution request. Based on the record before us, we are satisfied that the restitution request for funeral expenses was sufficiently specific.

We need not dwell long on Hughes's argument that he was not responsible for his wife's death and is therefore not obligated to pay restitution. Having been convicted of first-degree premeditated murder for causing his wife's death, this argument is without merit. *See* Minn.Stat. § 611A.04, subd. 1(a) (noting that victim has a right to restitution from a convicted offender).

---

3. Hughes also argues that no postsentence investigation was conducted. However, the restitution statutes do not require a postsentence investigation. *See* Minn.Stat. § 611A.045, subd. 2 (2010) (requiring the in- clusion of specific information in a presentence investigation report); *see also* Minn. Stat. § 609.115, subd. 2 (2010) (governing postsentence investigations).

■ Next, Hughes argues that his wife did not incur any out-of-pocket expenses and that the county could not collect for its payment of the funeral expenses. This argument also fails. The definition of "victim" includes government entities that incur losses as a result of a crime and a victim may request restitution for funeral expenses. *See* Minn.Stat. §§ 611A.01(b) (2010), 611A.04, subd. 1(a). To the extent his argument is that the Crime Victims Reparations Board was not entitled to seek restitution because the county paid the funeral expenses, Minnesota law explicitly empowers the Crime Victims Reparations Board to seek restitution on behalf of the Board or on behalf of victims. *See* Minn.Stat. § 611A.04, subd. 1a.

■ Finally, Hughes argues that he did not receive due process, but he does not specify how his constitutional right to due process was violated. The record indicates that Hughes had notice of the restitution request and that Hughes's attorney demanded a hearing based on the alleged lack of specificity in the request and the alleged unreasonableness of the request. The record further indicates that the trial court held a restitution hearing based on that demand and that Hughes was represented by counsel at that hearing. Thus, the record supports the conclusion that Hughes received all the process he was due.

For all of these reasons, we hold that Hughes is not entitled to any relief on his restitution claims.

### III.

■ We next address Hughes's argument that *Giles v. California,* 554 U.S. 353, 128 S.Ct. 2678, 171 L.Ed.2d 488 (2008), entitles him to relief because the trial court's admission of statements made by his wife before her death to the police and her divorce attorney violated his right to confrontation under the Sixth Amendment to the United States Constitution. Before trial, the State moved to introduce out-of-court statements made by Hughes's wife before her death. Hughes argued that the statements were not admissible under the Confrontation Clause of the Sixth Amendment to the United States Constitution because he was not able to cross-examine his wife about any of the statements. In response, the State argued that Hughes had forfeited his Confrontation Clause rights with respect to his wife's statements because he had procured her absence from the trial. The trial court granted the State's motion, in part applying the forfeiture-by-wrongdoing doctrine, based on its finding that Hughes was the cause of his wife's unavailability. In *Giles,* the Supreme Court held that the forfeiture-by-wrongdoing exception to the Confrontation Clause does not apply unless it is shown that in procuring the witness's absence from trial the defendant's purpose was to prevent the witness from testifying. 554 U.S. at 367, 128 S.Ct. 2678.

The postconviction court held that Hughes's claim, under *Giles,* was procedurally barred. According to the postconviction court, the claim was barred because Hughes could have raised the *Giles* issue in his petition for certiorari filed with the United States Supreme Court, but failed to do so. In the alternative, the postconviction court addressed the merits of Hughes's Confrontation Clause claim. The postconviction court essentially held that, to the extent the trial court erred in applying the forfeiture-by-wrongdoing doctrine, the error, if any, was harmless, reasoning that the Confrontation Clause did not bar the admission of the statements of Hughes's wife because the statements were not testimonial.

In response to the postconviction court's procedural ruling, Hughes argues that he

could not have raised *Giles* in his petition for writ of certiorari filed with the Supreme Court because the Court's opinion in *Giles*—although released on June 25, 2008—was not available in his prison law library until October 1, 2008, which was after the deadline for filing his petition for writ of certiorari. We assume—without deciding—that Hughes's claim based on *Giles* is not procedurally barred, and therefore reach the merits of his argument. On the merits, Hughes argues that, because he did not cause his wife's absence from trial with the intent to prevent her from testifying at the trial, the trial court's admission of the statements based on the forfeiture-by-wrongdoing doctrine was erroneous.

As a predicate to considering Hughes's *Giles* claim, we must first determine whether the statements at issue are inadmissible under the Confrontation Clause. In *Crawford v. Washington,* the Supreme Court held that testimonial hearsay statements are inadmissible at trial unless the declarant is unavailable and there was a previous opportunity for cross-examination. 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004). The Court declined to comprehensively define "testimonial," but said, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Further, while holding that testimonial hearsay statements are inadmissible absent confrontation, the Court also held that—with respect to *nontestimonial* hearsay statements—states have flexibility to develop and apply their own hearsay rules. *Id.* With respect to testimonial hearsay statements, the Court noted that it was not abolishing the forfeiture-by-wrongdoing exception to the inadmissibility of testimonial statements. *Id.* at 62, 124 S.Ct. 1354.

In *Davis v. Washington,* the Supreme Court discussed the application of *Crawford* to situations in which police officers question individuals in the context of gathering evidence to respond to an ongoing emergency as opposed to gathering evidence to prepare for future prosecution. 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). The Court defined the distinction as follows:

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 822, 126 S.Ct. 2266. The Court more recently discussed the Confrontation Clause in *Michigan v. Bryant.* The Court said, "the most important instances in which the [Confrontation] Clause restricts the introduction of out-of-court statements are those in which state actors are involved in a formal, out-of-court interrogation of a witness to obtain evidence for trial." *Michigan v. Bryant,* —— U.S. ——, 131 S.Ct. 1143, 1155, 179 L.Ed.2d 93 (2011). Under *Bryant,* we must "objectively evaluate the circumstances in which the encounter occurs and the statements and actions of the parties" to determine the primary purpose of the interrogation. *Id.* at 1156. When conducting our analysis, we consider whether "the information the parties knew at the time of the encounter would lead a reasonable person to believe there was an emergency, even if that belief was later proved incorrect." *Id.* at 1157 n. 8.

With this framework in mind, we consider whether the statements in question were testimonial. In his brief in this appeal, Hughes first argues that his wife's statements to her divorce attorney were testimonial because an attorney is "an officer of the court." According to the attorney's testimony, Hughes's wife called him on May 23, 2005, asking about representation in a marriage dissolution proceeding. When the two met later that day, the attorney followed his general practice of obtaining background information about the Hugheses' marriage, discussing child custody issues, and informing Hughes's wife about property and financial information that she would need to collect in order to facilitate the dissolution process. Hughes's wife told the attorney she wanted to pursue a divorce and seek custody of her children. She also described the nature of her marriage, indicating that there was a "control problem" and that she was intimidated by the fact that she was being told when she could see her children. On May 25, 2005, Hughes's wife had another meeting with the attorney, paid him a retainer, told him that she was going to talk to Hughes at home during lunch that day, and asked the attorney to begin marriage dissolution proceedings. Hughes claims that all of the statements made by his wife to the attorney and admitted at trial were testimonial and therefore inadmissible. Those statements include that there were control problems in the marriage and that she was going to talk to Hughes at their home over the lunch hour on May 25, 2005, to discuss the divorce proceedings.

Although we have not squarely addressed the issue of whether a statement is testimonial when it is made to an attorney who is not working as a government agent with an eye toward a criminal prosecution, several other courts have addressed the issue. In *Jensen v. Pliler*, the Ninth Circuit held that an attorney's jailhouse interview of a potential client did not produce testimonial statements because the "statements were not made to a government officer with an eye toward trial," the confession was not "formal," and the declarant could not have reasonably expected that the statements would be used in a prosecution. 439 F.3d 1086, 1089–90 (9th Cir.2006). Similarly, in *Garcia v. State*, the Texas Court of Appeals held that the victim's statements to her divorce attorney were nontestimonial because they did not fall within the categories of testimonial statements enumerated in *Crawford*. 246 S.W.3d 121, 133 (Tex.App.2007).

We conclude that the analysis of the courts in *Jensen* and *Garcia* is well-reasoned and persuasive.[4] Because there is no evidence that his wife's divorce attorney was a government agent or that the statements were made with an eye toward a criminal prosecution, we reject Hughes's claim that his wife's statements to her divorce attorney were testimonial.

■ Hughes also argues that his wife's statements to the police officers who conducted a welfare check on May 11, 2005, were testimonial. This argument is not supported by the record. The record indicates that Officer Davis spoke to Hughes's wife on May 11, 2005, following a request from one of her coworkers that the police conduct a welfare check. According to Officer Davis, Hughes's wife answered the door when he and another officer arrived at the Hugheses' home and, in response to his questions as to whether she was okay or if she was being held against her will, she replied that she was fine and that she

---

**4.** Because *Jensen* and *Garcia* were decided before *Bryant,* we do not rely solely on the reasoning of those two cases.

and Hughes were "trying to work things out." She further indicated she was alone and that Hughes was at church. Officer Davis testified that he and the other officer repeatedly told Hughes's wife that if she wanted to leave, leaving with the officers was a good time to do so; to which Hughes's wife responded that "she was okay." The welfare check lasted 10 to 15 minutes.

We conclude that none of the statements made by Hughes's wife during the welfare check, which were introduced through Officer Davis's testimony, were testimonial. While the officers conducting the welfare check went to the Hugheses' home because a coworker of Hughes's wife told the police that Hughes's wife had not shown up for work, and that the coworker was concerned that Hughes's wife was being held at her home against her will, there is nothing in the record suggesting that the questions the officers asked of Hughes's wife were aimed at anything other than assessing the situation and determining whether she needed any assistance. Nor is there any evidence to suggest that Hughes's wife made these statements to the officers with an eye toward a criminal prosecution of Hughes. Further, it can be inferred that the officers never saw or heard anything that would have suggested to them that a crime had been or was about to be committed. Consequently, nothing in the record suggests that the officers asked any questions, nor did Hughes's wife make any statements, with the purpose of "establish[ing] or prov[ing]

past events potentially relevant to later criminal prosecution." *Davis,* 547 U.S. at 822, 126 S.Ct. 2266.

Because we conclude that his wife's statements to her divorce attorney and the police were nontestimonial, the trial court did not violate Hughes's Confrontation Clause rights when it admitted the statements at trial. We therefore need not and do not consider whether the trial court erred in its application of the forfeiture-by-wrongdoing exception to the Confrontation Clause. Finally, all of Hughes's other claims are procedurally barred under Minn.Stat. § 590.01, subd. 1, because they were or could have been raised on direct appeal.[5]

Affirmed.

---

5. Citing *Boitnott v. State,* 631 N.W.2d 362 (Minn.2001), Hughes argues that we did not judge his pro se claims on the merits when he raised them on direct appeal and that those claims are not procedurally barred. Hughes—in effect—requests that we issue a longer opinion and individually address the merits of each issue. We rejected a similar argument in *Boitnott. See id.* at 369 (noting

that the rationale for the *Knaffla*-bar applies when a convicted person states claims "raised but not decided in a prior petition"). In Hughes's direct appeal, we said, "[w]e have carefully considered all of appellant's other pro se claims and hold that they are without merit." *State v. Hughes,* 749 N.W.2d 307, 318 (Minn.2008).