*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1591**

State of Minnesota,
Respondent,

vs.

Leonard James Fisherman, Jr.,
Appellant.

**Filed September 21, 2015
Affirmed
Ross, Judge**

Sherburne County District Court
File No. 71-CR-12-1906

Lori Swanson, Attorney General, Matthew Frank, Assistant Attorney General, St. Paul, Minnesota; and

Kathleen A. Heaney, Sherburne County Attorney, Timothy A. Sime, Assistant County Attorney, Elk River, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Richard Schmitz, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Peterson, Judge; and Ross, Judge.

**U N P U B L I S H E D   O P I N I O N**

**ROSS**, Judge

St. Cloud prison inmate Leonard Fisherman repeatedly punched and kicked another inmate in the head until he appeared dead. Appealing his consequent conviction

of first-degree assault, Fisherman argues that, as a "sovereign citizen," he is exempt from the criminal laws of Minnesota; that the prosecutor improperly informed the jury that he had previously killed someone; and that the district court misstated the reasonable-doubt standard. He also maintains that the district court should have ordered a pretrial mental competency examination. Fisherman's arguments range from baseless to unconvincing. We affirm.

## FACTS

Leonard Fisherman raped a 15-year-old girl at knifepoint and is serving a prison sentence in the St. Cloud correctional facility. In September 2012 a corrections officer saw (and three surveillance cameras recorded) Fisherman, who stands 6'5" and weighed 248 pounds, repeatedly punching another inmate on an elevated walkway. The inmate fell to the walkway and lay there, not fighting back and apparently unconscious, while Fisherman continued to kick him repeatedly in the head. A corrections officer ordered Fisherman to stop, but he would not. The victim inmate fell, head first, from the walkway to the concrete floor eight feet below. Another officer arrived and saw the inmate lying motionless in a pool of blood, appearing to be dead. Fisherman pounded his chest and shouted, "Just think, I just killed this motherf- - -er!"

The state charged Fisherman with first-degree assault.

The trial did not begin on schedule. On the day set for trial, Fisherman at first refused to leave his cell because the clothes his lawyer bought for him did not fit. He eventually presented himself but told the trial judge that he was not ready for trial for two reasons. The first was his clothes. He said that his family was bringing him clothes with a

better fit, and he wanted to wear those clothes for trial. The second reason was that he wanted more time to discuss trial strategy with his attorney. The district court explained that Fisherman could be positioned to minimize the jury's noticing the fit of his clothes. Fisherman then threatened to fire his attorney to prevent the trial from beginning. He enforced his threat by adding, "[I]f I fire my attorney I'm not -- I'm incompetent to proceed . . . . I'm going to need an attorney to cross-examine. I'm incompetent. I can't represent myself at trial. I don't know the objections." The district court acquiesced and agreed to delay the trial until the following morning.

Trial commenced the next day. Fisherman was "comfortably attired," and his attorney said that they "had more than enough time" to discuss their strategy. The jury then heard from multiple witnesses.

It first heard from the corrections officer who witnessed the beating. The officer explained that the pummeling occurred on a walkway suspended eight feet off the floor. The officer was on the floor level and witnessed Fisherman repeatedly throw "closed-fist punches" at the inmate's head. He observed Fisherman knock the inmate unconscious before repeatedly kicking him in the head as he lay motionless on the walkway. The officer told Fisherman to stop. Fisherman continued to kick the inmate's motionless body toward the edge of the walkway. The officer sprayed Fisherman with a chemical. At that moment, the victim inmate fell head first from the walkway to the concrete floor.

An emergency responder attended to the victim and testified that, based on the large pool of blood under the victim, he assumed that the man was dead. The jury saw video footage of the assault from three security cameras.

3

A surgeon testified that he treated the victim after he was brought to the hospital. The victim had a closed-head injury, a large trauma-induced epidural bleed, and a skull fracture. The surgeon explained that the injuries were life-threatening and called for immediate surgery. He testified that repeated punching and kicking to the head could cause epidural bleeding, as could falling eight feet onto a concrete floor.

The prosecutor began his closing argument by replaying two of the three video recordings. At the start of his statement, Fisherman interrupted, blurting out to the jurors, "I shouldn't have been in prison, guys. I'm falsely in prison." The prosecutor continued, first quoting Fisherman's post-beating boast:

> "Just think, I killed that f- - ker," as the defendant proudly, up in the gallery, looking over the body of [the victim], laying there with a pool of blood spreading out from his head. Beating his hands on his chest proud, proud that he thinks he ended another life, or a life. The silver lining of this case is that he was wrong on that.

The jury found Fisherman guilty of first-degree assault. Fisherman's appeal follows.

**D E C I S I O N**

**I**

We first address a jurisdictional argument that Fisherman makes only in his pro se supplemental brief. Fisherman argues that he is a "sovereign citizen," exempt from the laws of Minnesota, and that the district court lacked jurisdiction over his prosecution. We have considered this argument to the full extent that it merits consideration. The "sovereign citizen" jurisdictional defense has "no conceivable validity in American law." *United States v. Schneider*, 910 F.2d 1569, 1570 (7th Cir. 1990). The district court had

4

jurisdiction to try Fisherman because his criminal act occurred within Minnesota. *See* Minn. Stat. § 609.025 (1) (2012).

## II

Fisherman argues that we must reverse his conviction because the prosecutor's closing argument implied that Fisherman was serving a murder sentence for killing a different person, and the prosecutor therefore violated the parties' agreement that the prosecutor could not inform the jury as to why Fisherman was incarcerated. The argument is unconvincing.

Appellate courts review claims of prosecutorial misconduct under a modified plain-error test if, as in this case, the defendant did not object during trial to the alleged misconduct. *State v. Ramey*, 721 N.W.2d 294, 298–99 (Minn. 2006). Under that standard, Fisherman must first identify an error that is plain. *See id.* at 298. That is, he must identify an error that "contravenes case law, a rule, or a standard of conduct." *State v. Jones*, 753 N.W.2d 677, 686 (Minn. 2008). If Fisherman identifies a plain error, the state then bears the burden of demonstrating that the prosecutor's misconduct did not prejudice Fisherman's substantial rights. *See Ramey*, 721 N.W.2d at 300. That is, the state must show that there is no reasonable likelihood that the misconduct had a "significant effect" on the verdict. *Id.* at 302. Even if the appellant's claim of error clears these hurdles, we will reverse only if the error also "seriously affects the fairness and integrity of the judicial proceedings." *State v. Little*, 851 N.W.2d 878, 884 (Minn. 2014).

Fisherman's claim does not clear even the first hurdle. We see no misconduct in the prosecutor's statement that Fisherman thought he "ended another life." Fisherman

puts unjustified emphasis on the word "another." It is true that a reasonable juror might, as Fisherman argues, speculate that "another life" implies that the battered inmate is at least Fisherman's second victim. But even if the ended-another-life phrase was left unclarified, at worst, the phrase is ambiguous, and a prosecutor's ambiguous remark is generally not misconduct. *See State v. Lasnetski*, 696 N.W.2d 387, 398 (Minn. 2005) (finding a prosecutor's statement permissible where it could be considered either inviting the jury to deliberate quickly or showing appreciation for the jurors' service over the holidays). The phrase is ambiguous because a reasonable juror might just as naturally suppose that "another life" refers simply to a life other than Fisherman's life. This construction of "another" is certainly no stretch. When, for example, the legislature dictates that "[w]hoever . . . intentionally causes the death of *another* person in the heat of passion" commits manslaughter, Minn. Stat. § 609.20 (2014) (emphasis added), reasonable people understand that "another person" refers to a person other than the killer, not a person other than some previous victim of the killer. And this usage is not confined to law but occurs in everyday conversation. A mother might, for example, instruct her son, "Never copy another student's homework." We presume that a child of normal intelligence would not suppose that he is being accused of previously copying homework, but that "another" implies a student other than himself. Listing common examples of this usage of "another" could extend many pages.

Anyway, there is little ambiguity here. The prosecutor did not use the term "another life" by itself; he rephrased it. The prosecutor minimized any ambiguity by adding, "a life," in his immediate rephrasing: "Beating his hands on his chest proud,

6

proud that he thinks he ended another life, or a life." The prosecutor's appendage to the statement made it almost impossible for any juror to think he was suggesting that "another" referred to a previous killing. And without question, Fisherman thought he had ended "a life"—the beaten inmate's life.

We add that even if we accepted Fisherman's argument that the prosecutor persuaded the jury that Fisherman killed someone previously, still we would not reverse. This is because the state easily rebuts the presumption that Fisherman's substantial rights were prejudiced by the alleged misconduct. On this record, there is "no reasonable likelihood" that the alleged misconduct had a "significant" effect on the verdict. *See Ramey*, 721 N.W.2d at 302. This is because the jury actually saw the crime of which it found Fisherman guilty. Jurors watched a video recording that depicted Fisherman kicking the defenseless, unconscious man repeatedly in the head until he fell eight feet headlong onto concrete; and then they heard testimony describing Fisherman beating his chest celebrating his belief that he had just kicked the man to death. After actually witnessing Fisherman's vicious battering and hearing about his merriment, it stands beyond reason that the jury convicted Fisherman of grievously assaulting the man because of something other than the evidence that Fisherman grievously assaulted the man. The jurors received no evidence contradicting the notion that what they saw on the video recording was Fisherman committing the crime, and Fisherman's only defense was that the assault was not serious enough to constitute a first-degree offense. The overwhelming and unopposed direct evidence alone, not the prosecutor's reference to "another life," obviously explains the jury's verdict.

7

## III

Fisherman argues that the district court erroneously diluted the state's burden of proof and impermissibly instructed the jury that it could consider Fisherman's potential punishment while deliberating. He did not object to the instructions in the district court, so we review the challenged instruction only for plain error. *See State v. Hughes*, 749 N.W.2d 307, 315 (Minn. 2008). The defendant's right to due process requires the district court to instruct the jury that the state must prove beyond a reasonable doubt each element necessary to convict the defendant. *Sullivan v. Louisiana*, 508 U.S. 275, 278–79, 113 S. Ct. 2078, 2080 (1993). The district court instructed the jury that Fisherman "is presumed innocent" and that this presumption "remains with the defendant unless and until he has been proven guilty beyond a reasonable doubt." The district court repeated this reasonable-doubt instruction three times more. The district court summarized its instructions explaining that jury members "are judges of the facts" and emphasizing why the jury's role is important:

> It is important in the respect that a person who is guilty of the commission of a crime be brought to justice and be punished. It is equally important that a person who is not guilty of the commission of a crime should not be punished for something he did not do. This concludes my final instructions.

Fisherman concedes that the district court accurately and repeatedly explained the reasonable-doubt standard. But he argues that the district court "diluted" the standard in its statement that "a person who is guilty of the commission of a crime [should] be brought to justice and be punished," while "a person who is not guilty of the commission of a crime should not be punished for something he did not do." But he does not explain

8

how, and we do not believe that, this statement is at all linked to the state's burden of proof. Not only does the statement include no reference to the burden of proof, the district court made the statement long after accurately declaring the reasonable-doubt standard.

We also are unconvinced by Fisherman's argument that the district court's remarks "implied that the jury should consider the issue of punishment" in assessing guilt. The district court did not suggest that the issue of punishment should influence the question of guilt but that the issue of guilt would influence the question of punishment. And caselaw rejects Fisherman's argument that the district court commits plain error any time it injects the question of punishment into the jury's consideration regardless of what the injection entails. *See State v. Finley*, 214 Minn. 228, 231–32, 8 N.W.2d 217, 218 (1943) (holding no error where district court injected issue of punishment into its instructions by informing the jury it would consider defendant's punishment because it has "a lot more information about [the defendant] than you have now"). We see no error in the challenged instructions.

## IV

Fisherman argues that the district court was obligated, *sua sponte*, to order that he be examined to determine his mental competency. The court should have known that he may be incompetent, he argues, because he expressly declared to the court that he was "incompetent" and the court also knew that he had been held in solitary confinement before trial.

9

Fisherman's argument based on his incompetence declaration is specious. In an effort to leverage the district court to postpone his trial until his family arrived with better-fitting clothing, Fisherman threatened to fire his attorney and thereby force a delay, insisting, "I'm incompetent. I can't represent myself at trial. I don't know the objections." The context of Fisherman's incompetence statement plainly indicates that he was declaring himself to be *tactically* incompetent, not *mentally* incompetent. Every district court judge would recognize that Fisherman was asserting only that he was unskilled in the art of lawyering. No rational jurist paying attention to context would have ordered a competency hearing based on Fisherman's declaration.

Fisherman provides no legal or academic authority supporting his theory that solitary confinement reduces a defendant to mental incompetency, let alone supporting his theory that the notion is so evident that a district court judge who knows about a defendant's solitary confinement must order a competency hearing *sua sponte*.

**Affirmed.**