STATE OF MINNESOTA

IN SUPREME COURT

A23-0213

Court of Appeals                                    Moore, III, J.
                                   Took no part, Hennesy, Gaïtas, JJ.
State of Minnesota,

            Respondent,

vs.                                          Filed: November 13, 2024
                                          Office of Appellate Courts
Almanzo Ousley Cotton,

            Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Nicole Cornale, Assistant County Attorney, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Jennifer Workman Jesness, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

In determining whether to order an offender to pay restitution to the Minnesota Crime Victims Reparations Board under Minn. Stat. § 611A.045, subd. 1(a) (2022), for amounts paid by the Board to the victim under the Minnesota Crime Victims Reparations Act, Minn. Stat. §§ 611A.54–.68 (2022), courts may not apply the collateral-source provision of the Reparations Act, which governs the eligibility of claimants to receive reparations awards from the Board.

Affirmed.

1

MOORE, III, Justice.

We must determine here whether a district court may consider collateral sources that offset a claimant's economic loss under the Minnesota Crime Victims Reparations Act[1] (Reparations Act) when awarding restitution to the Minnesota Crime Victims Reparations Board under the restitution statute, Minn. Stat. § 611A.04-.045 (2022), for amounts paid by the Board to a victim. Because we conclude that the exclusive factors for a district court to consider when awarding *restitution* do not include the collateral sources available for purposes of *reparations*, we affirm.

**FACTS**

Appellant Almanzo Cotton was found guilty by a jury of one count of second-degree intentional murder and one count of second-degree unintentional murder for beating his girlfriend, Kim Laen Theng, to death. At sentencing, the district court sentenced Cotton to 306 months imprisonment on the second-degree intentional murder count and ordered Cotton to pay $2,362 in restitution to the Minnesota Crime Victims Reparations Board (the Board).

The district court issued this order based on the Board's request for restitution to cover the amounts paid by the Board to Theng's daughter, S.T. After the murder, S.T. arranged for her mother's cremation and paid $2,362 to a cremation service using her

---

[1]     *See* Minn. Stat. §§ 611A.51–.68 (2022). This law was renamed the "Minnesota Crime Victims Reimbursement Act" in 2023 after the relevant events in this case, but the amendments to the law did not substantively change its provisions. *See infra* note 3.

personal credit card. After S.T. paid for the cremation, an individual created a GoFundMe campaign[2] in honor of Theng, which named S.T. as the beneficiary. The campaign description contained a "general breakdown" of what the funds were intended to cover:

$12,000 Lawyer expenses / Case expenses / Restraining order
$1,000 Mom's memorial in Massachusetts / Room and board
$2,500 Cambodia / Scattering the ashes / Passport / Room and board
$1,000 Housekeeping / Preparations to sell the house
$2,000 Medical Expenses / Therapy / Group Therapy

S.T. began receiving money from the campaign account and also submitted a claim to the Board for $2,362 in reparations to cover the cremation expense. The Board approved S.T.'s claim and awarded her the full amount. S.T. continued to periodically withdraw money from the GoFundMe campaign account, which raised a total of $14,030.

Cotton challenged the district court's order requiring him to pay $2,362 in restitution to the Board, filing a motion requesting a restitution hearing and an affidavit in support of his motion. In his affidavit, Cotton argued that the reparations award from the Board to S.T. "appear[ed] to be a windfall" because the GoFundMe campaign covered a variety of expenses—including what Cotton described as "funeral expenses." At the restitution hearing, the district court received evidence regarding S.T.'s financial records and the Board's written crowdfunding policy. The Board's policy read, in relevant part:

Gifts/memorials, including GoFundMe accounts, are not deducted when the family indicates they are going to be used for expenses not covered by the

---

[2] GoFundMe is a company that offers an online platform for individuals to raise funds for an objective by "crowdfunding" their campaigns via individual donations from a vast network of people across the internet. *See What is Crowdfunding? The Clear and Simple Answer*, GoFundMe, https://www.gofundme.com/c/crowdfunding (last visited Nov. 7, 2024) [opinion attachment].

Board, such as a memorial for the victim or a fund for the victim's children. The victim is not obligated to inform the Board of amounts collected by social media accounts.

After considering the information presented in Cotton's restitution challenge, the district court issued a final restitution order affirming the $2,362 restitution award. It concluded that "[t]he funds raised by the GoFundMe campaign do not constitute recoupment of the cremation expenses from a collateral source" and that Cotton had "the ability to pay the entire amount of restitution awarded under a reasonable payment schedule." The district court explained that the GoFundMe proceeds could not be considered as a collateral source (which must be deducted from a reparations award under Minn. Stat. § 611A.54 (2022)), because "[t]he only related expense included in the GoFundMe request was the cost of bringing [Theng's] ashes to scatter in Cambodia, which would, by definition, occur after the cremation was complete."

Cotton appealed the district court's order to the court of appeals. *See State v. Cotton*, 996 N.W.2d 240 (Minn. App. 2023). He argued that the district court erred by not considering the GoFundMe proceeds available to S.T. when determining the amount of restitution he must pay to the Board. *Id.* at 247. But before reaching that argument, the court of appeals addressed what it identified as a "threshold issue": whether the provision in the Reparations Act mandating that *reparations* be reduced due to collateral sources applied to a district court's consideration of a *restitution* award. *Id.* at 244. The court of appeals concluded in a precedential opinion that the statutory scheme governing restitution and reparations define them as "distinct forms of relief" and that "the district court did not

4

err in calculating *restitution* without consideration of collateral sources that may have been available to or recouped by [Theng's daughter]." *Id.* at 246 (emphasis added).

Although the court of appeals affirmed the district court's determination that Cotton was required to pay the Board $2,362 in restitution, it concluded that the district court erred by not including a payment schedule or structure in its final restitution order. *Id.* at 248–49 (citing Minn. Stat. § 611A.045, subd. 2a (2022)). Accordingly, the court of appeals remanded "for the limited purpose of issuing a corrected restitution order." *Id.* After the court of appeals issued its opinion, Cotton filed a petition for review, which we granted.

## ANALYSIS

We review a district court's award of restitution for an abuse of discretion. *State v. Andersen*, 871 N.W.2d 910, 913 (Minn. 2015). But when a district court premises its restitution award on an interpretation of Minnesota statutes, we review its legal conclusions de novo. *State v. Currin*, 974 N.W.2d 567, 571 (Minn. 2022). Our aim when interpreting statutes is "to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16 (2022). A statute is unambiguous if its language "is clear on its face." *Currin*, 974 N.W.2d at 572. "The plain language of the statute controls when the meaning of the statute is unambiguous," *State v. Boecker*, 893 N.W.2d 348, 351 (Minn. 2017), and "words and phrases are construed according to rules of grammar and according to their common and approved usage." Minn. Stat. § 645.08 (2022). We may consider our prior interpretations of a statute "in reviewing subsequent disputes over the meaning of the statute." *Caldas v. Affordable Granite & Stone, Inc.*, 820 N.W.2d 826, 836 (Minn. 2012).

5

Minnesota Statutes chapter 611A provides for the rights of people affected by crime as well as the programs and agencies designed to help them. *See* Minn. Stat. §§ 611A.01–.95 (2022). Two separate mechanisms under this chapter are at issue in this case: restitution and reparations. Restitution is part of a criminal proceeding, while reparations[3] can be disbursed from a special account in the state treasury regardless of whether the perpetrator of a crime was prosecuted. The interplay of these two statutory methods for compensating persons affected by a crime is central to this case. We thus begin by summarizing each in turn and then address Cotton's arguments.

A.

Regarding restitution in criminal cases, as part of a sentence for a felony, gross misdemeanor, or misdemeanor conviction, the district court may sentence the defendant to payment of court-ordered restitution. Minn. Stat. §§ 609.10, subd. 1(a)(5), 609.125, subd. 1(a)(4) (2022). "Restitution" for sentencing purposes includes "payment of compensation to the victim or the victim's family" and "if the victim is deceased or has been fully

---

[3] In 2023, the Legislature amended the Act, replacing the word "reparations" with "reimbursement" in all instances. Act of May 19, 2023, ch. 52, art. 5, §§ 56–73, 2023 Minn. Laws 869, 907–914 (codified as amended at Minn. Stat. §§ 611A.51–.68 (Supp. 2023)). The amendment does not substantively change these statutes; rather, the change in terminology appears to have been made only to "better align with what the program does." Hearing on S.F. 1889, Sen. Judiciary and Pub. Safety Comm., 93rd Minn. Leg., March 6, 2023 (digital audio file) (comments of Sen. Oumou Verbeten, Senate author of the bill), at 16:34, https://www.lrl.mn.gov/media/file?mtgid=1047570. Cotton asks us to use the current statutory term—reimbursement—"to avoid future confusion," but acknowledges that the outcome of this case does not depend on which term is used. For this opinion, we use the term reparations, as it reflects the statutory language that was in effect when the events relevant to this appeal occurred.

6

compensated, payment of money to a victim assistance program or other program directed by the court." Minn. Stat. §§ 609.10, subd. 2(a)(1)–(2); 609.125, subd. 2(a) (1)–(2). Under Minnesota's restitution statute, a restitution request from a victim "may include, but is not limited to, any out-of-pocket losses resulting from the crime." *State v. Johnson,* 851 N.W.2d 60, 65 (Minn. 2014) (quoting Minn. Stat. § 611A.04).

"The primary purpose of restitution is to 'restore crime victims to the same financial position they were in before the crime.' " *Id.* (quoting *State v. Palubicki*, 727 N.W.2d 662, 666 (Minn. 2007)); *see also State v. Fader*, 358 N.W.2d 42, 48 (Minn. 1984) (noting that "the word 'restitution' connotes restoring or compensating the victim for his loss"). The Legislature has provided two factors that courts must weigh when considering whether to order restitution: "(1) the amount of economic loss sustained by the victim as a result of the offense; and (2) the income, resources, and obligations of the defendant." Minn. Stat. § 611A.045, subd. 1(a). We have previously held that these factors are "exclusive," meaning that it would be error for a court to "consider[] factors other than those set forth in the statute." *State v. Riggs*, 865 N.W.2d 679, 684 (Minn. 2015).

As to the first restitution factor, the "amount of economic loss sustained by the victim" is calculated by considering "the total or aggregate diminution or deprivation of money, goods, or services that a victim suffers as a direct result or natural consequence of the defendant's crime," while also considering "the value of economic benefits, if any, [the offender] *conferred on the victim* as a result of the offense." *Currin*, 974 N.W.2d at 573 (emphasis added); *see also id.* at 575 (concluding that the offender did not confer any economic benefit on the victim, Minnesota Department of Human Services (DHS), by

fraudulently billing DHS for nursing services DHS would have otherwise sought from another provider). The offender bears the burden of production in challenging a restitution request, but the State has the burden of "demonstrating the amount of loss sustained by a victim as a result of the offense" by a preponderance of the evidence. Minn. Stat. § 611A.045, subd. 3(a).

B.

The reparations process, on the other hand, does not require any person to have been prosecuted or convicted of the crime. Minn. Stat. § 611A.52, subd. 6(b). Reparations awards are disbursed from a special account in the state treasury, rather than paid directly from a criminal defendant. Minn. Stat. § 611A.612. Under this statute, a claimant[4] is entitled to reparations for any economic loss incurred as a direct result of the crime. *See* Minn. Stat. §§ 611A.52, subds. 4, 8, 10, 611A.53, subd. 1. Claims for reparations are overseen by the Board.[5] Minn. Stat. §§ 611A.55–.57.

---

[4] The terms "victim" and "claimant" have particular definitions under Minnesota's laws—and these definitions are not synonymous. Under the Reparations Act, a person who is entitled to reparations for economic losses resulting from a crime, whether or not any person is prosecuted or convicted, is referred to as a "claimant." Minn. Stat. § 611A.52, subd. 4 (2022). By contrast, persons entitled to restitution as part of the disposition of a criminal charge or a juvenile delinquency proceeding where the offender is convicted or found delinquent are referred to as a "victim." Minn. Stat. § 611A.04 (2022). Notably, the Reparations Act defines the word "victim" more narrowly than the restitution statute. *Compare* Minn. Stat. § 611A.52, subd. 10 (2022), *with* Minn. Stat. § 611A.01(b) (2022). For purposes of this opinion, we use the word "claimant" to refer to a person who is entitled to reparations under the Reparations Act and the word "victim" to refer to a person who falls within the statutory definition set forth in the restitution statute.

[5] The Board consists of five members appointed by the Commissioner of Public Safety. Minn. Stat. § 611A.55, subd. 1. The Legislature's 2023 amendment also changed

The Reparations Act directs that reparations "shall equal economic loss," subject to certain exceptions. Minn. Stat. § 611A.54. One of these exceptions is that "reparations *shall be reduced to the extent that economic loss is recouped from a collateral source*." *Id.* (emphasis added). This includes "any private source as a voluntary donation or gift." Minn. Stat. § 611A.52, subd.5(9).

C.

Turning to the dispute in this case, Cotton's primary objection to paying restitution to the Board is that the Board is not a "victim" under the restitution statutes, but rather serves only as an intermediary to the true victim of the crime. For the reasons stated below, we disagree. Cotton then raises concerns that, unless the collateral-source provision from the Reparations Act applies here, offenders will have "no recourse" against oversized reparations awards by the Board to victims. This argument is overstated and lacks merit. We address each of Cotton's arguments in turn.

First, Cotton posits that the Board is not a "victim," meaning that his payment to the Board is not restitution (which may only be requested by victims), and the reparations statutes control this case instead. Cotton's assertion, however, is soundly refuted by both the statutory text and our case law. It is true that as a claimant, S.T. was awarded *reparations* by the Board. But under the Reparations Act, the State assumes a subrogation right "to all the claimant's rights to recover benefits or advantages for economic loss from

the name of this Board to the "Crime Victims Reimbursement Board." Act of May 19, 2023, ch. 52, art. 5, § 62, 2023 Minn. Laws 869, 910 (codified as amended at Minn. Stat. § 611A.55 (2023)).

9

a source which is . . . a collateral source." Minn. Stat. § 611A.61, subd. 1; *see* Minn. Stat. § 611A.52, subd. 5(1) (including "the offender" as a collateral source); *see also Evans v. State*, 880 N.W.2d 357, 361 (Minn. 2016) (stating that, once the Board has awarded reparations to a victim, "it steps into the shoes of the victim"). And under the restitution statute, the "Board may request restitution on behalf of a victim," which may be "considered to be both on its own behalf and on behalf of the victim." Minn. Stat. § 611A.04, subd. 1a. The restitution statute expressly provides that, "[i]f the board has paid reparations to the victim or on the victim's behalf, the court shall order restitution payments to be made directly to the board." *Id.* Accordingly, we have recognized that "Minnesota law explicitly empowers the Crime Victims Reparations Board to seek restitution on behalf of the Board or on behalf of victims." *Hughes v. State*, 815 N.W.2d 602, 606 (Minn. 2012).

Essentially, the Board can compensate a claimant through *reparations* before criminal guilt is ascertained, *see* Minn. Stat. §§ 611.A52, subd. 6(b), 611A.53; then, the Board can seek *restitution* on its own behalf from an offender to recoup the money to which the victim would have been entitled to as restitution. *See Evans*, 880 N.W.2d at 360 (holding that "the term 'reparations' . . . is not synonymous with the term 'restitution' " because " '[r]eparations' refers to payments by [the Board] to the five listed entities for economic losses [under Minn. Stat. § 611A.53, subd. 1], whereas restitution refers to payments by the defendant to the victim for qualified economic losses"). Because under the restitution statute, the Board takes the role of a victim, and because Cotton is an offender, any payment by Cotton to the Board for qualified economic losses should be

10

treated as restitution—not reparations—meaning that the district court was obligated to follow the Legislature's directions for awarding restitution. Accordingly, the district court could only consider the two exclusive restitution factors set forth in the restitution statute: "(1) the amount of economic loss sustained by the victim as a result of the offense; and (2) the income, resources, and obligations of the defendant." Minn. Stat. § 611A.045, subd. 1(a).

The central question here is whether the Reparations Act's collateral-source provision—requiring that "reparations shall be reduced to the extent that economic loss is recouped from a collateral source"—plays any role in the exclusive factors to be considered by a district court when deciding whether the Board is entitled to restitution from an offender under the restitution statute. We hold that it does not. In *State v. Riggs*, we concluded that "the plain language of section 611A.045, subdivision 1, provides an exclusive list of factors for determining the amount of restitution to award." 865 N.W.2d at 685. In considering whether the contributory misconduct of the victim could be included for consideration under these factors, we reasoned that Legislature expressly included fault as a relevant factor in the *reparations* context, "but it did not include the victim's fault as a relevant factor in the *restitution* context. Without more, we cannot glean from the Legislature's omission its intention to include an unstated factor." *Id.* (emphasis added).

Our reasoning in *Riggs* applies with equal force to the application of the chapter 611A collateral-source provision at issue here, which is contained in the same statutory section as the contributory-misconduct provision and whose precise directives are similarly absent from the factors that may be considered for restitution awards. *Compare* Minn. Stat.

11

§ 611A.54(1)–(2) (providing that reparations "shall be reduced to the extent that economic loss is recouped from a collateral source or collateral sources" and "shall be denied or reduced to the extent, if any, that the board deems reasonable because of the contributory misconduct of the claimant") *with* Minn. Stat. § 611A.045, subd. 1(a) (stating that "[t]he court, in determining whether to order restitution and the amount of the restitution, shall consider" the two restitution factors, which only include "the amount of economic loss sustained by the victim as a result of the offense" and "the income, resources, and obligations of the defendant"). We observe, however, that although the collateral-source provision itself is not implicated in the determination of economic loss for restitution purposes, certain benefits received by a person affected by the crime may be relevant under both the collateral-source provision of the reparations statutes *and* the economic-loss calculation of the restitution statutes. Our decision today merely clarifies which rule governs here—we do not foreclose the potential for overlap between a benefit that may trigger the collateral-source provision for purposes of reparations and a benefit that may affect the aggregate economic loss sustained by a victim for purposes of restitution. Therefore, the district court in this case properly considered only "the amount of economic loss sustained by the [Board] as a result of the offense" and "the income, resources, and obligations of the defendant." Minn. Stat. § 611A.045, subd. 1(a).

Anticipating our conclusion on this point, Cotton expresses concern that our holding will lead to a system where offenders "have no recourse" against erroneous reparations awards from the Board to claimants. Effectively, Cotton argues, the Board could be incentivized to not investigate a claimant's reparations claim and to simply seek repayment

12

from a defendant in a restitution proceeding, regardless of whether the claimant is actually entitled to the total amount of the reparations claim. We disagree.

The Reparations Act mandates that the State "shall be subrogated" to a claimant's right to recover "benefits or advantages for economic loss" from an offender. Minn. Stat. §§ 611A.61, subd. 1, 611A.52, subd. 5(1). The effect of these provisions is that the Board (acting on the State's behalf) is limited to seeking restitution for *only* the amount the victim would be entitled to had the victim sought restitution directly from the offender. From the perspective of the district court, which, when ordering restitution, must consider "the amount of economic loss sustained by the victim," Minn. Stat. § 611A.045, subd. 1(a), the restitution determination must naturally be centered around the economic loss of the *victim of the crime*, and not the loss of the Board, which simply assumes the claimant's right to recover benefits. In addition, as we have just held, the economic loss of the victim is analyzed under the restitution statutes—not the reparations statutes—so the collateral-source provision remains inapplicable.

Accordingly, if the Board erroneously awards reparations to a claimant who was ineligible to receive them, an offender can still challenge the Board's subsequent restitution request on the grounds that the victim would not be entitled to restitution under section 611A.045, subdivision 1(a), had the victim sought restitution directly. In effect, the Board bears the potential cost if it awards reparations to a claimant under the Reparations Act that are greater than the amount the victim would be authorized to recover directly from the offender under the restitution statute. However, Cotton made no challenge as to S.T.'s hypothetical eligibility for restitution. In fact, he seems to concede that an award to S.T.

13

would have been proper had she sought restitution directly.[6]  Instead, Cotton argues only that "even if a defendant's payment to [the Board] is restitution," he "still prevails because [the Board] is not a 'victim' that can recover under the restitution statute."  As we have stated above, however, the Board is considered a victim under the restitution statute.

Accordingly, we conclude that the statutory directives of the collateral-source provision under Reparations Act do not apply when considering whether to order an offender to pay restitution to the Board under the restitution statute in the amount paid by the Board to the victim in accordance with Minn. Stat. § 611A.04, subd. 1a.  Rather, if an offender wishes to challenge an award of restitution to the Board, they must do so on the grounds that the restitution statute would have precluded or reduced recovery of the victim had the victim sought restitution directly.  Because all of Cotton's challenges to the sufficiency of the restitution award fail, we affirm the decision of the court of appeals.

---

[6]  Although we are not required here to determine whether it would have been proper to award S.T. restitution to recoup the cremation expenses she incurred, we note the limited scope of her reparations request.  S.T. did not seek reimbursement for the "total or aggregate diminution or deprivation of money, goods, or services that [she] suffer[ed] as a direct result or natural consequence of [Cotton]'s crime."  *Currin*, 974 N.W.2d at 573.  Rather, her reparations request sought compensation for one discrete expense that was not otherwise reimbursed.  In seeking to restore S.T. "to the same financial position" she was in before the crime, *Palubicki*, 727 N.W.2d at 666, it would make little sense to credit any donations S.T. received that were not made for the *purpose* of reimbursing the cremation expenses specifically.  Cotton's contention that a court would be required to deduct the GoFundMe donations from a restitution award simply because they were "received or readily available to S.T., regardless of how she used the donations," rings hollow.  *Cf. State v. White*, ___ N.W.3d ___, No. A23-0126, slip op. at 11 (Minn. Nov. 13, 2024) (reasoning that "an economic loss is . . . felt" when "a cash asset that would have been available for other purposes is no longer available").

14

**CONCLUSION**

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.


HENNESY and GAÏTAS, JJ., not having been members of this court at the time of submission, took no part in the consideration or decision of this case.

# What is Crowdfunding?
# The Clear and Simple Answer

Crowdfunding harnesses the power of social networks and the internet to give people the means to raise funds, help others overcome hardship, and meet aspirational goals. The core principle behind the crowdfunding definition is that you can help a friend or help an entire community.

You can do everything from raising money for your surgery to fulfilling a student's dream of attending college—and much more. You can also easily share your crowdfunding campaign via WhatsApp with friends and family or on TikTok and Instagram to use the power of social media.

If you've ever found yourself wondering, "What is crowdfunding?" "What does crowdfunding mean?" or "What are the benefits of crowdfunding?" then keep reading. We'll answer your questions about crowdfunding and give you top tips on bringing in donations.

**Start crowdfunding
(https://www.gofundme.com/create/fundraiser)**



## The rise of crowdfunding

In recent years, crowdfunding has transformed the traditional fundraising landscape, breaking down barriers between those in need and those available to help them. Individuals contributed the highest percentage of charitable giving in 2022, accounting for 64%(https://www.bwf.com/giving-usa-2023-report-insights/) of the total $499.33 billion in estimated charitable giving. Crowdfunding has made it possible for people to directly support those who need emergency financial assistance (https://www.gofundme.com/c/blog/emergency-financial-assistance), contributing to the larger trend of individual giving. People often turn to crowdfunding when they can't afford the rapidly increasing cost of medical care or health insurance and have to pay for out-of-pocket costs (https://www.gofundme.com/c/blog/out-of-pocket-medical-expenses). In fact, enormous medical bills (https://www.businessinsider.com/causes-personal-bankruptcy-medical-bills-mortgages-student-loan-debt-2019-6) are responsible for 66.5% of all bankruptcies in America. So how does crowdfunding work?

## What are the advantages of crowdfunding?

Sometimes, when government and nonprofit funding falls short, getting the help you need can be challenging. That's why crowdfunding can be such a valuable resource. It allows you to reach out to your community for support in a way that's easy and accessible. Whether you're facing financial difficulties or hoping to impact the world positively, online fundraising can help you achieve your goals.

For those looking for crowdfunding basics, here are some of the main advantages of crowdfunding:

There are no long wait periods to receive your funds.

Crowdfunding takes the fear out of asking for financial help. Sharing (https://www.gofundme.com/c/fundraising-tips/sharing) your fundraiser with your network of friends and family members on TikTok or Instagram is simple.

Crowdfunding makes it easy to reach people outside of your network.